**Harris WHITTEMORE, Jr.**

v.

**John J. FITZPATRICK, Collector of Internal Revenue for the District of Connecticut, and Frank W. Kraemer, formerly Collector of Internal Revenue for said District.**

**Civ. No. 3525.**

United States District Court,
D. Connecticut.

Oct. 26, 1954.

---

Robinson, Robinson & Cole, Hartford, Conn., Gager & Henry, Waterbury, Conn. (William W. Gager, Donald W. Henry, Waterbury, Conn., John C. Parsons, Hartford, Conn., of counsel), for plaintiff.

H. Brian Holland, Asst. Atty. Gen., Andrew D. Sharpe, William B. Waldo, Sp. Assts. to Atty. Gen., Adrian W. Maher, U. S. Atty., Edward J. Lonergan, Asst. U. S. Atty., Hartford, Conn., for defendants.

HINCKS, Circuit Judge.

The plaintiff brings this action against the Collector of Internal Revenue to recover an alleged overpayment of his gift tax for the year 1947. It is charged that the Commissioner erroneously assessed the value of certain stock transferred by the plaintiff to his three sons as gifts. The case was tried before the undersigned and the basic question for decision is the proper value to be accorded to the stock in question.

The plaintiff, who at the time owned all (820 shares) of the outstanding stock of the J. H. Whittemore Company, a family corporation, located in Naugatuck, Connecticut, on December 29, 1947, made a gift or gifts of 600 shares thereof to his three sons. The gift was accomplished by the transfer of 600 shares under an irrevocable deed of trust to two co-trustees, one of whom was a donee-beneficiary of 200 shares for the equal benefit of the three sons severally.

Under I.R.C. § 1005, 26 U.S.C.A., the value of a gift of property is determined as of the date of the gift, which in this case was December 29, 1947. Under Reg. 108, Section 86.19(a), "The value of the property is the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell. The value of a particular kind of property is not to be determined by a forced sale price." The same regulation provides that in the case of stocks or bonds, the value per share or bond as of the date of the gift "is to be determined by ascertaining as a basis the fair market value at the time of the gift of each unit of the property." However, by Reg. Par. 86.19(c) it is also provided that "in cases in which it is established that the value per * * share * * * established on the basis of selling or bid and asked prices * * * does not reflect the fair market value thereof, then *some reasonable modification* of such basis or other relevant facts and elements of value shall be considered" including, specifically, "the company's net worth, earning power, dividend-paying capacity, *and all other relevant factors having a bearing on the value of the* stock." (Emphasis supplied.)

### The Peter Paul Valuation.

The value of all the assets of the J. H. Whittemore Company, except 18,366 shares of Peter Paul, Inc., was stipulated at $1,825,032.27. But the parties are at issue as to the proper value of the Peter Paul stock. I now turn to a solution of that issue.

Peter Paul stock was not listed on any exchange. It was bought and sold over-the-counter. The National Quotation Bureau's service and other services published bid and asked prices for Peter Paul stock in 100-share lots. As of the critical valuation date the bid price for such lots was 44–45 and the asked price was 46–46½. Such evidence as there was of lower value as of July, 1948, was not shown to be within the period which a skilful broker would require for liquidation of the block here involved.

The plaintiff introduced opinion testimony that the size of the block, 18,366 shares out of 681,350 shares outstanding, was such that it could not be liquidated within the critical period required for skilful liquidation at a price above $30 to $35 per share. This testimony was based upon the belief that the existing market for the stock lacked the breadth and depth required for liquidation at a higher price. But as to this, the Peter Paul transfer books showed for the first six months of 1948 transactions involving 15,000 shares—a daily average for the period of 273 shares—although no single transaction in the period involved over 1,000 shares. Although there was no affirmative evidence that all these transactions were actual sales and, for aught that appears, some at least may have comprised gifts or bequests made without consideration, I find the evidence to be of some significance on the depth of the market.

The testimony of the defendants' expert witnesses, on the other hand, showed, I think, that they had made more extensive inquiry than the plaintiff's into the *breadth* as well as the depth of the market for the stock. They point to the fact that in November, 1947, the company, then having some 1,700 stockholders, put out a new issue of 11,000 shares all of which was subscribed for by existing stockholders at a price of $25. That fact, however, I consider of little importance as I am unable to see how a market for 11,000 shares at $25 tends to prove the existence of a market capable of absorbing 18,000 shares at a substantially higher price, especially since the evidence fails to demonstrate any active trading in the appurtenant *rights* beyond that incidental to fill out fractional holdings.

It is, however, of significant bearing on the *breadth* of the market that, as defendants' experts found, the stock was quoted in several quotation sheets which where published in locations outside Connecticut and New England and were generally available and consulted by those dealing in the over-the-counter market.

And although conscious of the fact that a mere quotation, even in a publication financially reputable, lacks, as evidence of value, the cogency of an actual sale price, such quotations are, I think, of real significance, especially in view of the testimony that the ethics of the over-the-counter market do not tolerate the publication of a quotation by a dealer not prepared to perform on the published basis. I will also confess to a personal view that the fact that a company has a number of plants scattered over a considerable area generally known to contain a large concentration of available capital, may be a factor in judging of the available market for its securities. However, not even the defendants' experts seem to have relied upon that factor in this case and being without reliable expert advice on the point I exclude that factor from my considerations.

On the record before me I am thus dependent upon the testimony of the experts. Unhappily for me they do not agree: their conclusions may be summarized as follows:

| Defendants' Witnesses | Value Per Share | Plaintiff's Witnesses | Value Per Share |
|---|---|---|---|
| Mr. Calhoun | $42.00 | Mr. Massie | $35.00 |
| Mr. Davidge | 41.80 | Mr. Chapman | 33.50 |
| Mr. Nees | 40.00 | Mr. Hossack | 30.00 |
| | | Mr. Johnson | 30.00 |
| | | Mr. Coates | 24.00 |

When confronted with such a conflict, the judge must weigh the experts' conclusions in light of a number of factors as disclosed by the testimony of each, tested against all the evidence. Here, for the quality of honesty I find none of the witnesses deficient. This conclusion is reached not only by my observation of each when on the stand but also by carefully scanning his testimony for symptoms of partisanship.

Perhaps next in importance is the expertness of the witness *in the specialized field* involved which, in the Peter Paul valuation, comprised the sale or distribution of an unusually large block of unlisted stock which can be accomplished only in the over-the-counter market. I

thus limit the relevant field because this is not a case in which, no bid and asked prices are available. That is not to say that I feel constrained to apply the precise value suggested by quotations for small lots to the block of 18,000 shares here involved. I quite agree that, somewhat as the value of a twenty-room mansion is not necessarily the same as five times the aggregate value of five four-room residences, so the small lot quotation is not conclusive as to the value of a large block of stock. I was sustained in so holding in Bull v. Smith, 2 Cir., 119 F.2d 490, and here even the defendants' experts agree that the quotations for small lots do not fairly represent the value of the block. I do think, however, that the evidence of quoted prices in this case is enough to preclude me from adopting a conclusion as to value based solely on the corporate net worth, earnings and dividend record, whether considered either independently or in comparison with other companies. At most such evidence may be considered as furnishing a check which may define one arm of a value-bracket which encompasses the valuation sought. I will add that even without any constraint in the law and regulations my own common sense suggests that for this case a valuation based on quotation prices suitably discounted to reflect the blockage factor will be more reliable than what might be called a synthetic valuation built upon the other approach.

In the specialized field defined above, I think the defendants' expert Mr. Nees appears to be the most thoroughly qualified. Notwithstanding the evidence of plaintiff's witnesses in the broader fields of banking and valuation, it appears to me that the problem here was one lying in the particular alley of Mr. Nees whose activities appeared to have been concentrated in the over-the-counter pastures grazed by brokers and investment bankers. Careful perusal of the transcript of his testimony, particularly when under cross-examination, and analysis of plaintiff's briefs satisfies me that his conclusions as to the value of Peter

Paul did not rest in unwarranted assumptions of fact. I have accordingly found that as of the critical date the block of Peter Paul stock in the Whittemore Company portfolio had a fair market value of $40 per share.

### The Whittemore Valuation.

This brings me to the main problem,—the fair market value of the J. H. Whittemore stock. In his original gift-tax return, the plaintiff valued the stock at $1,000 per share. The Commissioner assessed it at $3,228 per share. The defendants now recede from that position, admitting that the initial assessment was excessive. But the parties are still at issue as to the fair market value.

We are confronted at the outset with a question of law the proper solution of which will materially affect the ultimate result. The plaintiff contends that for present purposes the problem is as to the fair market value of 200 shares of the Whittemore stock. He argues that he made three separate gifts of 200 shares each and that each gift, for purposes of the Gift-Tax Law, should be separately valued. The defendants, however, contend that the only problem is as to the value of a block of 600 shares. They argue that, especially since all 600 shares were simultaneously transferred to the same two trustees, the tax should be measured by the value of the entire block. The conflict is of obvious importance for its impact on value because the power to vote 600 shares would carry power to elect the corporate directors,—not so, as to 200 shares. The point thus raised is an interesting one—at least to a tax-technician—and especially since, in a case in which both sides have been represented by counsel of unusual ability and diligence, no reference has been made to a controlling precedent the point is one, I believe, of first impression.

In considering this point it is important to remember that the problem is primarily one of federal tax law as distinguished from a problem in the field of contracts or of trusts. McHarg v. Fitzpatrick, 2 Cir., 210 F.2d 792. Not-

withstanding, there is inherent in the problem an underlying question as to whether the plaintiff * * * the settlor * * * made three gifts or only one. As to this, there can be no question that, as tested by the law of estates, i. e., the law governing *inter vivos* gifts, although under the deed of trust there was only one transfer which comprised 600 shares, there were three gifts: certainly each of the three sons received a gift. The McHarg case did not hold to the contrary: the question there was whether the deed of trust created three separate trusts or only a single trust for the benefit of three separate beneficiaries. I find nothing in the federal tax law which requires that, tax-wise for present purposes, the transaction, contrary to the substantive law of estates must be treated as one creating a single gift. Such a contention if made would have to be disposed of adversely to the defendants by the reasoning of Helvering v. Hutchings, 312 U.S. 393, 61 S.Ct. 653, 85 L.Ed. 909.

From this point on, I find no adjudicated cases which serve to chart my course nor, indeed, any relevant Treasury regulation interpreting the applicable federal statute which is, of course, the Gift Tax Law, I.R.C. § 1000 et seq., 26 U.S.C.A. § 1000 et seq.

I.R.C. § 1000 imposes a tax "upon the transfer * * * of property by gift * * * whether the transfer is in trust or otherwise." I.R.C. § 1001 provides that for *purposes of computing the tax* the "sum of the net gifts" for the taxable year, as also the "sum of the net gifts" for each of the preceding years, shall be aggregated. It is significant that this section says nothing about the valuation of the gifts: as its heading indicates, the aggregation is pertinent only to the "computation of tax" under the statutory scheme. I.R.C. § 1003 defines the term "net gifts" and it provides that "in the case of gifts * * * *made to any person* by the donor during the calendar year 1943 and subsequent calendar years, the first $3,000 of such gifts *to such person* shall not, for the

purposes of sub-section (a), be included in the total amount of gifts made during such year." (Emphasis supplied.) And sub-section (a) provides: "The term 'net gifts' means the total amount of gifts made during the calendar year, less the deductions provided in section 1004." Section 1003 is significant in that the $3,000 exclusion therein provided applies to gifts *made to any person* during the taxable year: it aggregates a plurality of gifts *made to one person* but distinctly does *not* aggregate gifts made to several persons. In passing, it may be noted, (although I attribute no controlling significance to the fact) that on the taxpayer's return for the taxable year here in question the Commissioner allowed the $3,000 "exclusion" on each of the three gifts here involved. I.R.C. § 1004 in providing a "specific exemption" aggregates—but only for purposes of *"computing* net gifts"—amounts claimed and allowed as specific exemptions both in the taxable year and in prior years.

I.R.C. § 1005 provides:

"§ 1005. Gifts made in property
"If *the gift* is made in property, the value *thereof* at the date of the gift shall be considered the amount of the gift." (Emphasis supplied.)

This is the first and only provision in the statute dealing directly with the valuation of the gift as distinguished from the computation of the tax. As its language plainly imports each gift made in property is to be valued separately. Not here or elsewhere does the statute provide or even suggest that, *for purposes of valuation,* gifts made to separate persons must be aggregated for purposes of valuation.

I conclude, therefor, that the plaintiff's position on this novel point is inherently sound and proceed with my task on that basis. However, it is necessary that I discuss the evidence relating to the value of a 600-share block because each witness who valued a 200-share block did so by reference to the valuation which he made of the larger block. And I consider it desirable not only to

discuss but also to make a finding as to the value of the 600-share block for such contribution as that finding may make to a final determination of this controversy in the event that on appeal my ruling, just indicated, that for present purposes the value of a 200-share block is determinative, shall be found to be erroneous.

For the Whittemore stock, there were no published quotations and no established market. None of the previous transfers of the stock were claimed by either party to have relevance to its value as of the critical date here involved. Both sides adduced opinion testimony as to its value from the same experts who testified as to the value of the Peter Paul stock. Of the three who were produced by the plaintiff, each gave his opinion as to the value of both a 600-share block and a 200-share block. Of the three who were produced by the defendants, only one testified to the value of a block of 200 shares. Their conclusions may be tabulated as follows:

| Defendants' Witnesses | Value Per Share (600) | Value Per Share (200) |
|---|---|---|
| Mr. Calhoun | $2,900.00 | $2,000.00 |
| Mr. Davidge | 2,800.00 | No Testimony |
| Mr. Nees | 2,800.00 | No Testimony |

| Plaintiff's Witnesses | Value Per Share (600) | Value Per Share (200) |
|---|---|---|
| Mr. Hossack | $1,500.00 | $1,000.00 |
| Mr. Massie | 1,400.00 to 1,600.00 | 1,200.00 |
| Mr. Chapman | 1,150.00 | Less than $850.00. |

The defendants ride hard on the argument that the value of the underlying assets is the best criterion of the value of the Whittemore stock as of December 29, 1947. This thesis they attempt to support by citing three United States Supreme Court cases: Guggenheim v. Rasquin, 312 U.S. 254, 61 S.Ct. 507, 85 L.Ed. 813; Powers v. Commissioner, 312 U.S. 259, 61 S.Ct. 509, 85 L.Ed. 817, and United States v. Ryerson, 312 U.S. 260, 61 S.Ct. 479, 85 L.Ed. 819. In the Guggenheim case [312 U.S. 254, 61 S.Ct. 509], the controversy did not concern the value to be accorded to the stock of a closely held family corporation, but rather involved single premium life insurance policies. It should also be noted that the court said that, " * * * the problem here involves an interpretation of the meaning of 'value' * * * unaided by an interpretive regulation." In this case, Regulation 108, Sec. 86.19, quoted above, is applicable. It by no means assigns to the element of net worth, at least in such a case as this, the importance which the defendants put upon that factor. The issues in the Powers and Ryerson cases were exactly the same as in the Guggenheim case. Even on their own facts it is questionable whether these cases support the proposition that the *single* factor of "net worth" is controlling in the determination of "fair value." For in the Guggenheim case the court noted that, "All of the economic benefits of a policy must be taken into consideration in determining its value for gift-tax purposes. To single out one and to disregard the others is in effect to substitute a different property interest from the one which was the subject of the gift."

The defendants made one other argument which I think unsound. In reference to the undisputed test of fair market value as being the price at which a willing seller and a willing buyer would complete a transaction, they argue that the plaintiff's experts overstressed the buyer's side of the equation: they contend that especially in view of corporate asset values, the plaintiff as the sole owner of the corporation would not be a willing seller at the only price which a buyer, according to plaintiff's experts, would buy. Surely this argument is irrelevant to the problem. To be sure, the test is hypothetical in that it assumes a sale when there has been no sale but only a gift. But if we are to use the required test we must, of course, apply it to a hypothetical owner who would be willing to sell at a price which a purchaser would pay. Thus the conventional equation precludes a result affected by non-commercial considerations on the part of either party to the hypothetical transaction. Certainly the

"value" for present purposes is not to be increased by reason of the fact that the plaintiff, because of his personal interest in farming, forestry or perhaps because of sentiment for an entity which for over fifty years has been a family corporation, would perhaps decline to sell except for a price higher than commanded by commercial considerations. However that may be, I see nothing in the testimony of the experts which justifies the criticism that in their approach to the problem they improperly neglected consideration of the price at which a hypothetical owner of Whittemore stock would sell.

Mr. Massie, a witness offered by the plaintiff, since 1921 has been a banker in positions in which he has been active in financial statistics and research with responsibilities for the investment of bank funds and customer funds. Since 1934 he has been an officer of the New York Trust Company, first as vice-president in charge of its investment department and investment research. Since 1945 he has been a director of that company and after tenure as executive vice-president in November, 1952, he became chairman of the board. He is also a trustee of Columbia University and a member of its finance and investment advisory committees, a director and member of an investment committee of two groups of insurance companies and of a savings bank. After familiarizing himself with the history and condition of the Whittemore Company he determined its net asset value and proceeded to value its shares from two practical approaches to the problem which were based upon his own practical experience. He recognized that, in estimating the value of a control block of 600 shares, any value predicated on control could be realized only by selling to a single purchaser who was facing a purchase involving in the neighborhood of $1,000,-000.

Mr. Massie's first approach was that of the fairly conservative investor who was purchasing as an investment. He thoroughly considered the factors that would be considered by such an investor —his powers of control, the liquidity of his investment, his opportunities to revamp the asset holdings of the Company, his net return by way of dividends as compared with other opportunities in the open market, the tax aspects of the purchase—all the factors which a level-headed investor contemplating such a large investment would consider. His judgment was that such an investor would pay between $1,429 and $1,630 per share. His second approach was that of the speculative investor who would buy the 600 shares in the expectation of liquidating the assets and distributing the net earnings, thus obtaining a capital gain. In this case he also presented the factors which, based on his practical experience, come into play. The necessity of acquiring full control to avoid litigation, the time factor bearing in mind the non-liquidity of certain underlying assets, the risk factor and margin of profit, the expenses and operating losses involved, the tax features, —again all those matters which a man placing somewhere near $1,000,000 in a speculative venture would consider. He concluded that such a speculator could be interested at a price around $1,500 a share.

Having these two possibilities in mind Mr. Massie's conclusion was that the value per share of 600 shares of J. H. Whittemore Company stock was in the range of $1,400 to $1,600—or to average it out, a value of $1,500 per share. This equals 50% of $3,000 which he assumed to be the per share asset value. On the other hand, on the basis of a minority interest such as 200 shares, Mr. Massie expressed the opinion that the per share value of 200 shares was only $1,200. That figure, it may be noted, equals 40% of the postulated per share asset value of $3,000, thus in effect representing the asset value discounted by 60%. The size of this 60% discount was based solely on his judgment as to the comparative desirability of two invest-

ments; one with comfortable majority control and the other wholly without control.

Mr. Chapman, another witness offered by the plaintiff, graduated from the Harvard School of Business Administration in 1927 and thereafter has continuously been connected with the Merchants National Bank of Boston. For ten years he was an investment analyst in the trust department, studying securities and managing trust funds. Since 1947 he has been president of the bank. He has been a trustee and director in a savings bank, a fire insurance company and a number of large industrial and mercantile companies and a treasurer or member of a finance committee of many large charitable organizations. He is the president of the Monroe Company which resembles the Whittemore Company in that it is a family corporation having a portfolio of securities and formerly a business interest as well.

Mr. Chapman made a very careful analysis of the entire situation. He considered the investment climate of December, 1947, the general market yields, the nature of the particular company and its operations, the relation of market value to asset value in banking and insurance companies and in closed-end investment trusts, and the lack of marketability for J. H. Whittemore Company stock. He concluded that the fair market value per share for 600 shares of J. H. Whittemore stock would be $1,150 per share. This conclusion reflected his opinion as to the effect of undesirable features of a 600-share block of Whittemore stock which was large enough to carry control but short of the 75% which, under the law of Connecticut, was required for complete liquidation and corporate dissolution.

When asked to state his opinion as to the value of a 200-share block, Mr. Chapman stated with candor that he had not fully considered that problem. However, speaking from actual experience he emphasized the difficulty of disposing of a substantial minority interest not carrying control of a closely held corporation and concluded that the smaller block would have a value not over $850.

Mr. Hossack, another witness offered by the plaintiff, as president of the American Appraisal Company, was a professional appraiser who in that capacity had appraised many kinds of property, and occasionally had made appraisals of family corporations. He pointed to a group of closed-end investment trusts which in an established market sold at prices showing substantial discounts off their respective net asset values, the discounts varying from 52% to 15%, with one such trust (out of the fourteen compared) selling with no discount. He found the average discount for the group to be 28%. Taking into account the facts that the Whittemore Company, unlike the companies compared, had a substantial commitment in non-liquid assets and that for the five years preceding the valuation date the value of its security portfolio had not increased as much as the average increase for the companies compared, he expressed an opinion that to arrive at the value of a 600-share block, the Whittemore net asset value should be discounted by about 50% (more accurately 48%) and by about 66%, for a 200-share block.

The defendants offered three witnesses, Messrs. Calhoun, Davidge and Nees. Mr. Calhoun, the only expert witness called by the defendants who testified at all as to value of a 200-share block, is a graduate mining engineer and a lawyer who since 1944 has been employed by the Court Defense Section of the Bureau of Internal Revenue. Prior to that assignment, he had been a chief mining engineer, superintendent of a steel and iron company and coal mine, and for twelve years, as an employee of the Geological Survey, an administrator under the Mineral Leasing Act concerned with the examination and valuation of mineral properties. It was his task as a staff-member of the Court Defense Section to assist in formulating recommenda-

718

tions as to value, independent of the Commissioner's valuation, of any type of property the valuation of which was in dispute between the Bureau and a taxpayer. His testimony on direct examination was directed to the valuation of a 600-share block which he thought was worth $2,900. Only on cross-examination did he testify as to the value of a 200-share block. And even then he conceded that a minority holding less than control was worth substantially less than a control block of 600 shares. He said merely "I don't think that one share would be worth over $2000." But as I read his testimony he justified that conclusion—if such it was intended to be—only by the assumption that a minority share-holder lacking control could organize a syndicate to acquire enough stock to provide control. Quite apart from the questionable permissibility of that assumption on the facts here, his own testimony suggests that by this approach he was reflecting in his valuation of a 200-share block a potential right of control which in fact it lacked. In effect his testimony was that 600 shares had a value less than a postulated asset value of $3,164 by about 8%, and that for a 200-share block the appropriate discount from the same base was about 36%.

Mr. Davidge, after graduation from the Harvard School of Business Administration in 1943, has been active as an investment counselor in Washington, D. C. for about six years. Unlike Mr. Calhoun, he based his conclusions in large part by applying to the asset value of the Whittemore Company the discounts at which two small groups of closed-end investment trusts sold in an established market. The discounts off asset value for these two groups of investment trusts were 22% and 29%, respectively. He concluded that a purchaser for a 600-share block of Whittemore stock could be found at a price of 29% off asset value.

Mr. Nees is a member of a Washington firm engaged in investment banking and the general security business. For ten years he had had active experience in charge of the over-the-counter business of the firm and in managing for the firm an open-end investment trust. Because of his extensive experience in the over-the-counter market I found his testimony especially helpful in my valuation of the Peter Paul stock. When he came to a valuation of the Whittemore stock, although his end-figure was about the same as that reached by Messrs. Davidge and Calhoun, he attached little importance to the discount from asset value at which other companies such as closed-end investment trusts had sold. And yet he said that this was "a special situation involving control in a company of the nature of a closed-end investment company." He predicated his conclusions on the reactions he would expect from three types of possible buyers; (1) one who would buy for liquidation, (2) one who would buy to exploit the tax and merger potentials of the corporation, and (3) one who would buy for investment.

Considering the mass of testimony thus derived, it appears to me that all the experts in practical effect reached their conclusions by applying to the asset value of the corporation a discount believed to be required to reflect the pertinent features of a 600-share investment in such a company. To recognize and evaluate the pertinent factors and to reflect their combined weight in a specific conclusion, required an exercise of the judgment faculties. For this task I find the plaintiff's witnesses, especially Messrs. Massie and Chapman, the better qualified. Because of their great and broad experience in banking and in investment affairs and the great responsibilities which they have carried in that general field, I think it reasonable to believe that their judgment has been tempered and refined by an awareness of all pertinent considerations to an extent beyond that to be expected of the defendants' witnesses. As the substance of his testimony shows, Mr.

Nees' peculiar qualifications to speak on matters pertaining to the over-the-counter market necessarily were not pertinent to the valuation of the Whittemore stock.

The defendants' witnesses, moreover, seem to me to have omitted or underestimated the impact of unfavorable features and to have weighed certain features not existing in fact as having a favorable tendency. Although, to be sure, a block of 600 shares would not only carry voting control but also constitutes more than the two-thirds majority required by General Statutes of Connecticut, § 5222, for authorization of a merger, I find it hard to believe that at a price of $2,800 a buyer could be found who would attach value to the bare possibility of merging this corporation, having non-liquid assets including farm property and works of art aggregating almost $500,000 in value, with some other corporation. And in discussing the considerations deemed attractive to one who might purchase out of hope of gain either by liquidating the company or continuing it as an investment company, the defendants' witnesses seem to me to attach insufficient weight to the degree and the duration of the hazard of loss from the impact of taxes and other factors. One thought that the inclusion in the portfolio of the Peter Paul and the Colonial Trust Company stock indicated that the portfolio was desirable as an investment. But it seems only sensible to believe that even one interested in buying for investment purposes would give at least some consideration to the marketability of the investment. As Exhibit F shows, an investor, buying in the hope that these two securities would rise in value, on a liquidation would be faced—if his hopes came true —with a taxable gain over cost to the corporation of $641,190 for Peter Paul and of $106,000 for the Colonial Trust stock. It is hard for me to believe that a buyer of Whittemore stock at the moderate discount over asset value suggested as appropriate by the de-fendants' witnesses, would be attracted by an opportunity thus to acquire an indirect interest in Peter Paul and Colonial Trust subject to this substantial tax liability when he could enjoy the expected appreciation in values by buying directly free from that tax liability. Nothing in the testimony suggests to me that these witnesses gave full consideration to that factor.

The same observation applies to testimony that the company stock would be attractive at the price suggested by defendants' witnesses to one buying for purposes of liquidation. The entire portfolio of securities as of December 29, 1947 had a market value exceeding its cost to the corporation of $678,000. Exhibit F. Forthwith liquidation of the entire portfolio would therefore result in a substantial gain the proportionate tax on which would have to be absorbed by the buyer whether the liquidation be accomplished by the company and distributed to the stockholders in cash or by dividends in kind to the stockholders. Cf. Commissioner of Internal Revenue v. Hirshon Trust, 2 Cir., 213 F.2d 523. Furthermore, to approach the problem from the standpoint of one who would buy for liquidation only seems to me untenable in view of the fact that under General Statutes of Connecticut, § 5229, investment of three-fourths of the voting stock is required for dissolution of a corporation. The buyer of 600 shares only would have slightly less than three-fourths of the stock: he could fully liquidate only at the hazard of suit by minority stockholders. And in valuing a 600-share block on that basis he is in effect valuing a block of slightly, but critically, greater size.

Moreover, I think the defendants' witnesses generally unduly minimized the risk inherent in the posed situation. It is true the stipulation, supplemented by my finding as to Peter Paul stock, indicated an asset value for the corporation of $3,118 as of December 29, 1947. But the stipulation and finding do not import that a forthwith liquidation on

that basis could be completed on that date, but rather that that value could be realized within the period reasonably required for a skilful liquidation begun on that date. I think Mr. Nees' assumptions that a skilful liquidator would be exposed to risk for a period no longer than 60 days—that "offsetting" transactions could even be accomplished within 7 days—were the product of unwarranted optimism. I should question the implication that a buyer of 74% of the stock, before he was in actual control would willingly assume personal liability for selling short 100% of the portfolio. Nor was it explained how offsetting transactions could be made for the non-liquid assets.

One would expect the period of risk would last at least until the next annual meeting of the corporation when the new owner of 600 shares would first have opportunity to elect his own board. Under the corporate by-laws the annual meeting comes on the third Monday of January in each year on five days' notice. A buyer of corporate stock whose acquisition was not completed in time to vote at the January, 1948, meeting could not exercise his power of control until the next annual meeting in 1949. Having in mind that the corporation owned non-liquid assets, including farm property and works of art worth upwards of $500,000, as well as a portfolio comprising 48 securities in enterprises having a wide range of situs and product, it is by no means certain that the inauguration of a sale on December 29, 1947, could have been fully accomplished in time for the purchaser to have voted in the January, 1948, annual meeting. It cannot be assumed on that evidence that a purchaser who would be interested in acquiring an indirect fractional interest in such a melange of assets could be so quickly found. Nor does the testimony show that these factors were duly considered and reflected in the expressed conclusions. Obviously, a potential buyer when approached would need time to investigate.

I thus find the defendants' testimony far from convincing when it predicates the values testified to on the reactions of those who might buy for investment, liquidation or for merger.

Far more persuasive for its impact on my mind was the reasoning of the plaintiff's witnesses. Mr. Chapman noted seven well-managed closed-end investment trusts which, from the aspect of the tax impact on dividends payable to investors, he considered comparable to Whitemore viewed as an investment company. These, he noted, sold at an average discount of 44% off asset value. This fact has real significance. Of course this testimony about other companies having established markets for their securities, such as these specified investment trusts, has no bearing on the Whittemore's portfolio value. But it was not offered on that issue. Indeed, no evidence on that issue was needed: the Whittemore asset value was stipulated. The significance of the testimony lies in its tendency to show that an investment unit in a large mass of securities generally sells in established markets at a price substantially less than the market price, per unit, for the underlying securities. Such evidence thus provides room for the inference that if shares in such investment trusts sell at substantial discounts from asset value, one cannot expect to find a market for Whittemore stock except at a price discounted from its asset value in an amount—which may as well be expressed percentage-wise as in dollars—reflecting the various factors—those which, individually, are elements both of strength and of weakness—pertaining to Whittemore as compared with the corresponding factors pertaining to the investment trusts. Concededly, such comparison furnishes no formula or percentage for automatic application: in the last analysis the amount of the appropriate discount can be determined only by exercise of the

judgment faculties. But such evidence may usefully serve not only as a check on the judgment product itself but also, and more important I think, as tending to show that the conclusion expressed was the product of a better informed judgment reached not in a vacuum but only after tempering by due consideration of a relevant factor.

Furthermore, in the determination of an appropriate discount for application to asset value, consideration might properly be given to the fact, to which allusion was made in Mr. Chapman's testimony, that the large and well-known investment enterprises, whose units sell at an average discount of 44% off asset value, are managed by persons whose repute for investment acumen is well known to the investing public, whereas there is room for inference that as to this small Naugatuck corporation neither the quality of management nor its repute for acumen is generally known to the investing public.

Mr. Chapman's testimony showed clearly that he did not overlook the fact that capital invested in 600 shares of Whittemore would carry control but invested in any of the specified investment trusts would not carry control. Accordingly, he treated the acquisition of control as a factor favorable to investment in a 600-share block of Whittemore. Nevertheless it was his judgment that because of the comparative unmarketability of Whittemore stock, its ownership of over $500,000 in non-liquid assets, its comparative earnings and dividend-paying record, and the size of the investment involved, Whittemore stock could only be sold at a greater discount off asset value than the investment trusts mentioned. And in the exercise of his well-informed and experienced judgment he fixed the appropriate discount as "certainly not less than 50% and certainly not more than 60%." Thus far his conclusion impresses me as inherently reasonable. His testimony discloses that no important factors were overlooked and that all factors relied on were neither distorted nor nonexistent.

The witness thus bracketed the indicated value for a 600-share block by an approach which I approve as the best possible for a proper solution. Finding no evidence which helps me to more precisely fix the value within that bracket, and having in mind that the burden of proof is on the plaintiff, I take Mr. Chapman's testimony as supporting only that arm of the value bracket which is the less favorable to the plaintiff, namely 50%. Applying that discount to the per share price—$3,000—which Mr. Chapman assumed, I take his testimony as supporting a value of $1,500 which coincides with the valuation made by the plaintiff's other witnesses reached on the same postulated asset value. In so doing I disregard as an over-refinement Mr. Chapman's suggestion that the discount might well be increased by another $50 (1.66% on the $3,000 base) to reflect the responsibilities of management which would rest on the owner of a controlling of block of Whittemore stock.

Although convinced that I may safely rely on the soundness of the conclusions of the plaintiff's experts, because their ultimate conclusion was expressed on a postulated basis of $3,000 per share, it is necessary to correct their conclusion to reflect the correct asset value as found. The stipulated assets, exclusive of Peter Paul was $1,825,032.27. Add to this $734,640 representing what I have found to be the fair market value of Peter Paul, and deducting stipulated liabilities of $1,920.27, I reach a figure of $2,557,752, which represents a per share asset value of $3,118. By applying a 50% discount to that figure I find that as of the critical date the fair market value of a 600-share block was $1,559 per share.

This leaves for solution the valuation of a 200-share block. All plaintiff's experts together with Mr. Cal-

houn, who was the only expert offered as to that issue by the defendants, agreed that the smaller block has a per share value substantially less than a control block of 600. I agree with Mr. Chapman who pointed out that especially in view of the lack of market for the stock, there would be extraordinary difficulty in finding a buyer who would invest something· over $200,000 in a minority interest in a Naugatuck corporation such as the Whittemore Company without an established dividend-paying record, of which about one-quarter in value of its assets was in non-liquid and deficit producing items. In their valuation of this block it is implicit in the testimony of plaintiff's experts that they took into account all the factors discussed in valuing the 600-share block, adjusting their conclusions to reflect the obvious fact that less capital was involved and that the smaller block did not carry control.

Having approved the proposition that the asset value should be discounted by 50% to reflect the value of a 600-share block, it appears to me reasonable to conclude that the 200-share block would have a value of $1,057 per share. This figure is the average ($1,017) of the three separate valuations made by plaintiff's three experts, corrected to reflect my finding that the asset value, with Peter Paul valued at $40, is $3,-118 per share. If, as I have found, asset value should be discounted by 50% to arrive at the value of a control block, nothing in the record suggests that it is out of line to use a discount of 66% (approx.) to reach the fair market value of a 200-share block.

██ Feeling well content to rest upon the combined and informed judgments of the plaintiff's three experts, I find that for a 200-share block the fair market value as of December 29, 1947 was $1,057 per share. I hold that the plaintiff's gift tax should be recomputed on that basis and that the resulting overpayment the plaintiff is entitled to recover with interest.