ESTATE OF HARRY G. STODDARD, deceased, ROBERT W. STODDARD AND PARIS FLETCHER, CO-EXECUTORS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Stoddard v. Commissioner
Docket No. 3797-73.
United States Tax Court
T.C. Memo 1975-207; 1975 Tax Ct. Memo LEXIS 155; 34 T.C.M. (CCH) 888; T.C.M. (RIA) 750207; June 30, 1975, Filed Phillips S. Davis and Carl J. Marold, for the Petitioners. Barry J. Laterman, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION. DRENNEN, Judge: Respondent determined a deficiency of $854,668.40 in the Federal estate tax due from the estate of Harry G. Stoddard. The only issue for decision concerns the value of 30,000 shares of common stock in Worcester Telegram & Gazette, Inc., owned by decedent at the time of his death. FINDINGS OF FACT The parties have stipulated to some facts, which we find accordingly. Harry G. Stoddard died May 21, 1969, a resident of Worcester, Mass. Petitioners Robert W. Stoddard and Paris Fletcher are the executors of the estate; at the time of filing of the petition *156 herein, their address was in Worcester, Mass. On or about August 17, 1970, petitioners filed a Federal estate tax return for decedent's estate with the district director of internal revenue in Boston, Mass., electing the alternate valuation date, May 21, 1970, as the date of valuation of the estate's assets. Decedent died owning 30,000 common shares in the Worcester Telegram & Gazette, Inc. (hereinafter the "company"), representing 20 percent of the 150,000 shares of the only class of stock outstanding on May 21, 1970. The company, incorporated in 1925 under the laws of Massachusetts, is and was on May 21, 1970, engaged in publishing newspapers and operating a radio station, in Worcester, Mass. There have been no sales of shares in the company since its incorporation. The company's stock is not registered for public sale. The company publishes the Worcester Telegram, a morning newspaper (daily and Sunday), and the Worcester Gazette, an evening paper (daily except Sunday). Both papers are published in, and their coverage is limited principally to, Worcester County. The radio station, also in Worcester, broadcasts with 5,000 watts of power on the AM band and is affiliated with *157 the National Broadcasting Co. network. In 1968 the company acquired two smaller daily newspapers, the Marlboro Enterprise in Marlborough, Mass., and the Hudson Daily Sun, in Hudson, Mass., which are published through a subsidiary corporation, Enterprise-Sun, Inc. The Enterprise and Sun, with a combined circulation of about 8,500, were purchased by the company for an aggregate price of $425,000, or about $50 per subscriber. The company's history indicates stability. Circulation of the Worcester Telegram, Evening Gazette, and Sunday Telegram during 1965 through 1969 was as follows: Worcester
The Evening
Sunday Year
Telegram
Gazette
Telegram
1965
60,954
94,844
105,838
1 966
62,932
95,275
109,529
1967
62,185
94,901
108,376
1968
62,153
94,463
108,685
1969
61,979
94,296
107,206 The company's net profit from operations for the years 1965 through 1969 may be summarized as follows: Net
Net Profit
Dividend Year
Profit [1]
Per Share
Share
1965
$628,789.21 [2]
$4.19
$2.00
1966
722,214.92 [2]
4.81
2.00
1967
428,288.00
2.86
2.00
1968
697,577.00
4.65
2.00
1969
527,061.00 [3]
3.51 [1]
2.00
1970
504,141.00
3.36
N.A.
*158 At the same time, prospects for growth in circulation have not been good, as the market to the east of Worcester County is dominated by large Boston newspapers seeking to expand their own circulations westward. Indeed, the company made its acquisition of Marlboro Enterprise and the Hudson Daily Sun largely for defensive purposes, to consolidate its position against encroachment by the Boston newspapers. The net book value of the company's stock at the end of 1969 was $7,023,244.42, or $46.82 per share. On May 31, 1970, the net book value was $6,701,130, or $44.67 per share. The company's balance sheet (certified) as of December 31, 1969, was as follows: ASSETS
Current Assets:
$ 420,213.95
Cash in banks and on hand
U.S. government securities, at cost
(market value - $1,095,125.00)
1,145,088.91
Accounts receivable
$1,394,778.95
Less: Allowance for doubtful accounts
$ 12,500.00
Reserve for allowance and
discounts
109,331.68
121,831.68
1,272,947.27
Accrued interest receivable on investments
16,923.00
Notes receivable - employees
31,975.68
Inventories - at lower of cost or market
281,778.32
Prepaid expenses
38,125.62
Total Current Assets
3,207,052.75
Investment in and Advances to Wholly-Owned
Subsidiary, Enterprise-Sun, Inc.: (note 1)
Investment in capital stock, at cost
425,000.00
Advances
180,701.55
605,701.55
Other Investments, at cost (not in excess of market)
61,299.50
Cash Value of Life Insurance
174,630.86
*159 Property, Plant and Equipment: (note 2). Accumulated
Cost
Depreciation
Net
Land
$ 1,097,300.89
$1,097,300.89
Buildings
4,303,813.32
$1,861,834.76
2,441,978.56
Machinery and equipment
3,919,743.52
1,587,916.33
2,331,827.19
Office furniture-and
fixtures
404,399.63
138,519.49
265,880.14
Factory furniture and
fixtures
23,794.83
6,345.28
17,449.55
Automobiles
190,927.10
86,051.95
104,875.15
Type metal
88,263.76
40,289.36
47,974.40
Morgue
50,141.50
37,641.50
12,500.00
New construction and
equipment (in progress)
23,209.30
23,209.30
$10,101,593.85
$3,758,598.67
6,342,995.18
TOTAL ASSETS
$10,391,609.84 [4]
LIABILITIES AND STOCKHOLDERS' EQUITY Current Liabilities: Accounts payable: Trade creditors
$312,232.60
Employee payroll deductions
105,172.86
Newsdealers deposits
610.50
$ 418,015.96
Accrued expenses: Vacation pay
218,930.58
Salaries and wages
61,717.84
Commissions payable
12,295.35
Miscellaneous
813.88
293,757.65
Accrued taxes: Payroll taxes
21,118.70
State corporation excise tax
19,621.81
Federal income tax
102,396.39
143,136.90
Current maturities on long-term debt
28,000.00
Total Current Liabilities
882,910.51
Long-term Debt: (note 3)
Mortgage note payable
210,000.00
Less: Current maturities
28,000.00
182,000.00
Deferred Income: Unearned subscriptions
61,843.46
Stockholders' Equity: Capital stock, common, $10 par
150,000 shares authorized, issued
and outstanding
1,500,000.00
Retained earnings: Unappropriated $5,523,244.42
Appropriated for retirement
benefits (note 4) 2,241,611.45
7,764.855.87
Total Stockholders'
Equity
9,264.855.87
TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY
$10,391,609.84
*160 The company's balance sheet (uncertified) as of May 31, 1970, was as follows: Assets
Current Assets
$ 3,451,552
Other Assets
Cash Surrender Value of
Life Insurance
$ 174,631
Miscellaneous Investments
61,229
235,860
Fixed Assets (less
depreciation)
6,885,922
Total Assets
$10,573,334
Liabilities and Capital
Current Liabilities
1,347,736
Mortgage and Notes Payable
(not currently due)
282,857
Long-Term Liabilities
Past Service Pension
Liability - Insured
Program
757,163
Accrued Pension Liability -
Uninsured Program
1,484,448
2,241,611
Capital Stock and Surplus
Capital Stock
1,500,000
Surplus
5,201,130
6,701,130
Total Liabilities and Capital
$10,573,334
Both the Telegram and the Gazette are edited and published in the company's plant in downtown Worcester, which also houses the studios and administrative offices of the radio station. The buildings are about 50 years old, but in good repair. Most of the company's printing is done with the "hot type" (linotype) process rather than the more modern "cold type" (photographic) process, although by the alternate valuation date, the company had made a partial conversion *161 to the latter. The average age of the company's presses was about 30 years. As of May 21, 1970, the shareholders of the company were as follows: Howard M. Booth, Robert W. Booth [5] and Robert S. Bowditch,
Trustees u/w of George F. Booth, b/o Doris Booth
Butler et al
20,600
Paris Fletcher and Phillips Ketchum, Trustees u/i
of Harry G. Stoddard dated December 28, 1934,
b/o Robert W. Stoddard, Marion S. Fletcher et al.
30,000
Howard M. Booth [5]
14,700
Robert M. Booth [5]
14,700
Phillips Ketchum, Trustee u/i of Harry G. Stoddard
dated March 8, 1954, b/o Patricia A. Fletcher et al.
10,000
H. G. Stoddard Estate
30,000
Marion S. Fletcher
6,750
Robert W. Stoddard
6,750
The Stoddard Charitable Trust
6,500
Paris Fletcher, Trustee u/i of Harry G. Stoddard
dated March 8, 1954, b/o Valerie Stoddard et al.
10,000
150,000
On the Federal estate tax return for the Estate of Harry G. Stoddard, petitioners showed a total value of $660,000, or $22 per share, as of the alternate valuation date, for the 30,000 shares of the company's stock owned by decedent at the time of his death. In his notice of deficiency, respondent determined *162 a total value of $2,100,000, or $70 per share, for the same stock. ULTIMATE FINDING OF FACT On May 21, 1970, the alternate valuation date herein, the value of decedent's stock in the company was $1,100,100, or $36.67 per share OPINION We are asked to determine the value of 30,000 shares of stock in a newspaper publishing and radio broadcasting company, which was owned by decedent Harry G. Stoddard at his death. The company, Worcester Telegram & Gazette, Inc., was incorporated in 1925 under Massachusetts law. It has one class of stock outstanding, of 150,000 shares, none of which have been sold since the company's inception. The company publishes four daily newspapers and operates a 5,000 watt AM radio station in and around Worcester County, Mass. On the Federal estate tax return for decedent's estate, petitioners elected the alternate valuation date, May 21, 1970, as the reference point for valuing the company's stock. The Federal estate tax return filed by petitioners listed the stock as worth $660,000 or $22 per share. Respondent's notice of deficiency assigned a value of $70 to each share, for a total of $2,100,000. Both sides have departed to different degrees from their *163 original positions: Petitioners have submitted an appraisal report showing a value of $720,000, or $24 per share; respondent introduced two reports, one estimating a value of $1,440,000, or $48 per share, the other finding the stock to be worth $1,271,100 or $42.37 per share. Petitioners' evidence consisted primarily of testimony and an appraisal report by petitioners' expert witness, Elgin Groseclose. Respondent's principal evidence was testimony and appraisal reports by his experts, Ellis A. Evans and Lloyd B. Ritchey. The three experts used somewhat different approaches in making their appraisals, a circumstance which complicates our task resolving them. Petitioners' expert, Elgin Groseclose, has a long and distinguished career of professional accomplishment. He has been, at various times, Treasurer-General of Iran, an assistant professor of the University of Oklahoma College of Business, a lecturer in banking and finance at the City College of New York, and financial editor of Fortune Magazine. Since 1944 he has been a private consulant and has rendered expert testimony numerous times before this Court and other Federal Courts and agencies. In his appraisal of the stock here *164 in issue, Groseclose did not use a set formula. Groseclose inspected the company's physical properties and interviewed the company's management. [6] Groseclose's appraisal report examined financial data covering two newspapers, the Boston Herald-Traveler and the Cincinnati Enquirer, whose shares were being regularly traded over the counter at the time of the valuation date herein, which offered "some basis for comparison" with the company because they involved "publication of a general interest newspaper in a single city [as] the principal business, with an adjunct radio station." The report abstracted for each of those two papers the price/earnings ratio based on the mean earnings per share over a 5-year period, the same ratio based on the earnings in 1969, and the dividend yield per share in 1969. Application of the results thereby obtained to the company yielded a mean value per share of $42.68 and a median value of $43.05. Groseclose's report also applied to the company the same ratio as above regularly compiled on 50 publicly traded stocks by Barron's, a widely-known financial journal, *165 which covered May 22, 1970. The results were a mean value of $40.22 per share of the company's stock and a median value of $39.31. The report prefaced derivation of these figures with a statement that use of the Boston and Cincinnati newspapers would offer "insufficient basis" for valuing the company's shares; in his testimony before this Court, Groseclose indicated that he did not consider either of the two newspapers above to be truly comparable to the company for valuation purposes and implied that he also had not accorded great weight to the values indicated by the Barron's averages above. [7]
Instead, Groseclose's appraisal appears to have been based principally on a somewhat subjective estimate of what the decedent's shares would have been worth as a source of earnings and dividends. Groseclose estimated *166 a base value of $36 per share, or approximately 10 times the 1969 per share earnings. To that figure, he applied a 33-1/3-percent discount to reflect the shares' lack of public marketability, reaching a value of $24 per share. Groseclose stated in his report that this final appraisal was in itself a reasonable value, noting that the annual $2 dividend the company had been paying would thus represent a 8-1/3-percent return on investment, "or about what high grade bonds yielded." Respondent's first expert witness at the trial of this case, Ellis A. Evans, appears to have spent most of his professional career in areas of investment banking and management, beginning in 1950. At the time of trial, he was an investment analyst for an insurance company. Evans testified that he had performed valuations of businesses seeking underwriting services while he was employed by brokerage houses in the 1960's. In 1970 and 1971, Evans was employed by the Internal Revenue Service in its Valuation and Analysis Section. Evans' educational background does not appear to include formal training in valuation. From 1946 to 1949, Evans attended the School of Engineering of George Washington University; from *167 1951 to 1952, he attended night courses in investment banking at American University. Evans testified that he had made an appraisal of one newspaper during his employment by the Internal Revenue Service. Evans' appraisal method was to assign a value of $100 per newspaper subscriber, a method Evans testified he obtained by "checking with people in the industry." In his report, Evans also derived a value of $100 per subscriber by examining sale prices and circulation figures for 17 newspapers sold between 1962 and 1969, as follows: (1)
(2)
(3)
(2)./. (3)
Year of
Sale
Daily
per
Sale
Price
Circulation
Subscriber
Philadelphia Inquirer
1969
$55,000,000
961,696
$ 57
San Bernadino Sun
1968
17,700,000
118,000
150
Journal News
1969
15,500,000
124,500
124
Stockton Daily Record
1968
11,675,000
67,000
174
Osala Star Banner
1969
4,100,000
22,363
183
Cleveland Plain Dealer
1967
54,200,000
640,289
85
Denver Post
1966
39,000,000
425,500
92
Tribune & Times
1966
16,300,000
282,500
58
Sacramento Union
1966
2,640,000
80,062
33
Fremont Tribune
1966
2,000,000
14,300
140
Red Bank Register
1965
2,000,000
22,980
87
Mid Athens Banner Herald
1965
1,708,217
12,590
136
Schenectadv Union Star
1965
1,250,000
30,615
41
Berkley [sic] Daily Gazette
1965
1,000,000
14,000
71
Adrian Telegram
1964
2,150,000
18,598
116
Sioux Falls Argus Leader
1963
5,000,000
79,500
63
Times Picayune
1962
45,600,997
504,500
90
Average: $100 [8]
*168 To avoid duplications in circulation, Evans applied the $100-per subscriber figure only to the 1969 daily circulalation of the largest of the company's newspapers, the Evening Gazette, 94,296. Evans rounded the resulting $9,429,600 to $9,500,000, or $63.33 per share. Evans then applied a 25-percent discount for nonmarketability and/or a minority interest to reach his final appraisal of $48, rounded from $47.50 per share. As a check, Evans noted that his appraisal resulted in a price-earnings ratio of 13.7 for the company's stock, compared with a 14.1 average ratio for 11 publicly-traded newspaper stocks, and an average ratio of 12.7 for five of the 11 which Evans considered to be "in close conformity" to each other (i.e., which remained after six ratios which appeared abnormally high or low had been discarded). Evans' report also considered, but did not *169 adopt, a valuation standard of twice annual revenues which Evans obtained from an article dealing with the newspaper industry in the October 1, 1969, issue of Forbes magazine. The total value thus achieved was $31,443,740, or $209.62 per share. Respondent's second expert witness at trial, Lloyd B. Ritchey, has a strong background in engineering. Between 1936 and 1971, Ritchey taught engineering at the University of Illinois, George Washington University, the University of Minnesota, and the West Virginia Institute of Technology, at which he was dean of the engineering school. During the same period, Ritchey worked in engineering, consulting, and supervisory capacities for several firms in private industry, including E.I. duPont de Nemours & Co., Inc., in Wilmington, Del., and the Babcock & Wilcox Co., in Lynchburg, Va. Since March 1971, Ritchey has been employed as a valuation engineer by the Internal Revenue Service in Washington, D.C. Ritchey testified that in the 2 or 3 years preceding the date of trial herein, he had performed appraisals of about six closely held newspaper corporations. In his appraisal report, Ritchey examined seven methods for valuing the company's stock, *170 summarized as follows: Value Method
Per share
Subscriptions plus fixed assets
$ 93.33
Capitalizing Income
70.98
Gross Income ratio
125.77
Adjusted book value
50.95
Price to earnings ratio
49.49
Price to book value ratio
111.67
Dividend Yield
60.60 Although Ritchey performed the first four valuation methods above, his actual appraisal was based on a weighted average of the last three. Tabulating published figures regarding 11 publicly traded newspaper companies, Ritchey obtained an average price-earnings ratio, an average price to book value ratio, and an average dividend yield as follows: Price to
Price to
Percentage
Earnings
Book Value
Dividend Company
Ratio
Ratio
Yield
Cincinnati Enquirer Co.
15.3
2.6
3.9
Dow Jones & Co.
26.4
8.4
4.2
Federated Publications, Inc.
8.8
1.5
5.4
Gannett Co.
14.1
1.5
2.3
Knight Newspapers, Inc.
11.7
1.5
2.0
Lee Enterprises, Inc.
13.0
1.1
2.1
New York Times, Inc.
11.4
2.1
4.0
Ridder Publications, Inc.
8.8
0.9
2.8
Thomson Newspapers, Ltd.
27.0
5.8
1.2
Times Mirror Co.
13.4
1.8
1.7
Boston Herald Traveler, Inc.
5.6
0.6
6.4
Average
14.1
2.5
3.3
*171 Ritchey then assigned a weight of three to profits (price earnings), two to dividends, and one to book value. The rationale for Ritchey's weighting scheme does not appear in the record. Ritchey obtained an average value of $63.56 per share of the company's stock, as follows: Item
Amount
Ratio
Amount
Factor
Total
Profits
$ 3.51 (1969)
14.1
$ 49.49
3
$148.47
Dividends
2.00
3.3%
60.60
2
121.20
Book Value
44.67
2.5
111.67
1
111.67
Total
6
$381.34
Average
$ 63.56
Ritchey then applied a discount for nonmarketability of 33-1/3 percent, for a final value per share of $42.37. Each side has made numerous objections to the appraisal methods and techniques of the other. We have studied these objections, along with the appraisal reports and other evidence, with great care, and the merits of all find proper reflection in our ultimate finding of fact. While we thus will not engage here in a detailed, point-by-point critique of the evidence and our weighing of it in making our determination of value, see Morris M. Messing,48 T.C. 502, 512 (1967), we do, however, deem it appropriate to discuss the parties' *172 arguments dealing with the general approaches of the appraisal experts. Petitioners argue that respondent's experts erred by using data on publicly traded companies to establish a base price for the company's stock. Petitioners' theory appears to be that because the company's stock was not registered for public sale, and because ownership of the decedent's minority interest would not in itself confer the power to cause registration of the stock, comparison of the company with publicly traded businesses was improper in a theoretical sense. Petitioners cite Morris M. Messing,supra at 509, and other cases, [9] for the proposition that "a publicly traded stock and a privately traded stock are not, as respondent would have us assume, the same animal distinguished only by the size, frequency, or color of its spots. The essential nature of the beast is different." At the same time, respondent urges that petitioners' expert erred fundamentally by not taking into account publicly traded issues in making his valuation and that, therefore, his appraisal *173 is entitled to little weight. Respondent cites section 2031(b), [10] I.R.C. 1954, as quoted in the margin. We find Messing and the other cases cited by petitioners to be inapposite on this point. In Messing, privately held stock was registered and offered for public sale somewhat after the valuation date, and the respondent sought to use the public offering price as the value on the valuation date, with a discount only to reflect the difference in time between the valuation date and the date of public *174 offering. The other cases cited by petitioners feature similar factual patterns. In the instant case, however, respondent's experts sought to establish a base value by examination of issues publicly traded as of the valuation date, and then applied a discount to reflect the lack of public marketability of the company's stock. This approach has been followed in a variety of decisions by this and other courts, see Edwin A. Gallun,T.C. Memo. 1974-284; South Carolina National Bank v. McLeod,256 F.Supp. 913 (D.S.Car. 1966); Whittemore v. Fitzpatrick,127 F.Supp. 710 (D.Conn. 1954); and we do not find it to be defective here, especially in light of the adjuration of section 2031(b), I.R.C. 1954, supra.It appears petitioners themselves recognize the validity of this approach: Their brief cites the above cases in arguing for the 33-1/3 - percent discounts applied by petitioners' expert, Groseclose, and respondent's expert, Ritchey. [11]
*175 Petitioners' expert's failure to rely on data from publicly traded stock does not vitiate his appraisal, however. The record as a whole does contain sufficient reference to the public marketplace to enable this Court to make a determination of value in conformity with section 2031(b), I.R.C. 1954. Elgin Groseclose has immense personal expertise in valuation matters. We have studied his findings carefully and accorded them appropriate weight in reaching our own decision. Upon careful consideration of all the facts and circumstances revealed by the entire record before us, we have concluded that as of the valuation date in this case, a proper base value for the company's shares held by the decedent was $55 per share, and that a proper discount to be applied to that figure for lack of marketability and the minority interest it represented is 33-1/3 percent, for a final value per share of $36.67, or $1,100,100 for the total value of the decedent's 30,000 shares. Decision will be entered under Rule 155.
Footnotes
1. After Federal and State Taxes. ↩
2. Net profit for 1965 and 1966 was computed by adding to current net profit in 1965 a $281.63 tax refund received that year and subtracting from current net profit in 1966 a payment of $2,514.92 in additional taxes for 1965. ↩
3. Reflects 1969 operating loss of $6,497 of Enterprise-Sun, Inc., acquired in December 1968.↩
4. Our computation shows this amount to be $10,391.679.84, but the above amount is a stipulated figure which cannot be reconciled by the evidence before us.↩
5. Not related to decedent.↩
6. Respondent's experts also visited and inspected the company's plant and management.↩
7. Groseclose also testified that in his opinion, the net book value of the company's stock was also not of great significance in valuing the stock, because a purchaser of the decedent's shares would not, by virtue of owning them alone, be able to compel a liquidation, and because he found no evidence to suggest that liquidating the company was otherwise contemplated.↩
8. We observe that this average, figured on a newspaper-by-newspaper basis giving equal weight to each newspaper, differs from the average of $80.97 per subscriber which would result if the sales prices for the 17 newspapers were summed (yielding $276,824,214) and divided by the total circulation for the 17 (3,418,993).↩
9. Cecilia A. Tallichet,T.C. Memo. 1974-255, and Bruce Berckmans,T.C. Memo. 1961-100↩.
10. Sec. 2031(b)↩. Valuation of Unlisted Stock and Securities--In the case of stock and securities of a corporation the value of which, by reason of their not being listed on an exchange and by reason of the absence of sales thereof, cannot be determined with reference to bid and asked prices or with reference to sales prices, the value thereof shall be determined by taking into consideration, in addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange.
11. Indeed, petitioners seem to have put themselves in the position of wanting to have their cake and eat it too. If, as they urge, the company's stock were valued solely as a source of annual dividends, there would be no need for a discount for nonmarketability. The very approach taken would have removed the stock from the public marketplace. In sum, petitioners seem to have applied what amounts to a double discount for lack of public marketability.↩