**CITIZENS BANK & TRUST COMPANY,
et al., Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL
REVENUE, Respondent–Appellee.**

No. 87–1536.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 2, 1987.

Decided Feb. 16, 1988.

James A. Clark, Schiff, Hardin & Waite, Chicago, Ill., for petitioners-appellants.

Mary Frances Clark, Asst. Atty. Gen., U.S. Dept. of Justice, Washington, D.C., for respondent-appellee.

Before POSNER and FLAUM, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

POSNER, Circuit Judge.

This appeal from the Tax Court presents a difficult question in the administration of the federal gift and estate taxes. The essential facts are simple, however. After a

merger of several commonly owned corporations, four siblings—John and William Curran, Cecilia Simon, and Judy Pokorny—each owned 25 percent of both the voting and nonvoting common stock of the Curran Contracting Company. The company is a substantial corporation involved in manufacturing, distribution, and real estate. It is managed by John and William Curran. The four siblings wanted to maintain family ownership and control of the enterprise as far into the future as possible. To this end, on May 7, 1976, acting in concert, each of the four created identical trusts, named "76–1," to which each transferred all of his or her voting stock. On the same day, all but Judy Pokorny created identical trusts named "76–2" to which each transferred all of his or her nonvoting stock. Each 76–1 trust made the brothers co-trustees with power to appoint their successors, and made the settlors—and the settlors' descendants as far into the future as the Rule Against Perpetuities permits—the beneficiaries. The terms of the 76–2 trusts were the same as those of the 76–1 trusts except that the grantor's spouse (rather than brother) was the initial trustee. Each trust in both series was to become irrevocable after 20 days or upon the death of the settlor, whichever occurred first. It was estimated that, unless revoked within the 20–day period, each trust would last for 97 years from the date of its creation.

Cecilia Simon died on May 11, whereupon the trust that she had created became irrevocable. The trusts of the two brothers, along with Judy Pokorny's 76–1 trust (remember that she had created no 76–2 trust), became irrevocable on May 27, not having been revoked previously. So there were four irrevocable 76–1 trusts and three irrevocable 76–2 trusts.

The parties agreed that estate tax was due on the transfer of stock to Cecilia Simon's trust and that gift tax was due on the transfers of stock to the trusts that became irrevocable on May 27 by the terms of the trust instruments. But the Internal Revenue Service was not satisfied with the valuation placed on the stock by John and William Curran and by Cecilia's estate, and

assessed deficiencies which the taxpayers contested in the Tax Court.

At trial each side presented an expert witness on valuation. The principal disagreement between the experts, and the only one we need discuss, concerned the "marketability discount" for the stock in the 76–2 trusts. Stock in closely held corporations is not so freely marketable as stock that can readily be liquidated by sale in a public market, so it is worth less. See generally Fellows & Painter, *Valuing Close Corporations for Federal Wealth Transfer Taxes: A Statutory Solution to the Disappearing Wealth Syndrome*, 30 Stan.L.Rev. 895, 916–21 (1978). The taxpayers' expert took the position that anyone buying nonvoting stock from any of the three taxpayers on the eve of the trusts' becoming irrevocable would have insisted on a 90 percent discount from what would otherwise be the fair market value. Such a buyer would know that 75 percent of the corporation's voting stock would be locked up for 97 years, making it well-nigh impossible for this buyer to gain control of the company—for he would acquire no voting rights at all and he could hardly expect to persuade the trustees of the voting stock (John and William Curran, or successor trustees appointed by them) to sell stock held by the trusts to him at a reasonable price. The buyer would know, moreover, that a major reason for establishing the trusts had been to ensure that the corporation remained in the control of persons who would refrain (to the extent allowed by the Internal Revenue Code) from paying dividends and would instead plow all corporate earnings back into the company so that it would provide better employment and investment opportunities for future generations of Currans.

The government's expert disregarded the terms of the trusts and testified that a 20 percent discount for lack of ready marketability was the highest that could be justified. The government's position was that the value of the stock transferred to the trusts must be determined without regard to the terms or indeed existence of the trusts. The Tax Court agreed.

It is hard to believe that the terms of the trusts could make as much difference in the marketability of the stock as the discrepancy between the two discounts for marketability implies. Investors drastically discount events in the far future; at a discount rate of 10 percent a year, the present value of a dollar to be received in 50 years is less than one cent. The real impediment to the ready marketability of stock in Curran Contracting Company is, not trusts intended to perpetuate that ownership and control into the far future, but family ownership and control. But the quarrel in this case isn't over the reasonableness of the experts' different valuations given their assumptions; it is over the assumptions. The issue is whether the terms of the trusts should have been taken into account in valuing the shares, as the government's expert refused to do.

█ A gift to a revocable trust does not take effect for purposes of gift or estate tax until the trust becomes irrevocable. *Burnet v. Guggenheim*, 288 U.S. 280, 53 S.Ct. 369, 77 L.Ed. 748 (1933); 5 Bittker, Federal Taxation of Income, Estates and Gifts ¶ 122.3.1 (1984). Cecilia Simon's two trusts became irrevocable when she died on May 11, so May 11 is the date of the gifts of her stock to the trusts. The trusts of her two brothers became irrevocable on May 27, so May 27 is the date of their gifts of stock to the 76–2 trusts. It is, of course, the date the three 76–1 trusts (all but Cecilia Simon's) became irrevocable as well. But as there was less disagreement between the experts on the valuation of those trusts, we shall not have to discuss them separately, and can confine our attention to the valuation of 25 percent of the nonvoting common stock on May 11, and of each of two 25 percent chunks of the same stock on May 27. The relevant concept of value, the parties agree, is market price, the price the owner of the shares would have gotten on these dates by selling the shares in an arm's length transaction rather than giving them away.

The government relies on a line of cases that infer from this definition that value is to be measured at the instant before trans-

fer, so that the amount of tax depends on the value of the transferred property in the hands of the transferor rather than its value in the hands of the transferee. See *Estate of Curry v. United States*, 706 F.2d 1424, 1426–30 (7th Cir.1983); *Ahmanson Foundation v. United States*, 674 F.2d 761, 767–69 (9th Cir.1981); cf. *Ithaca Trust Co. v. United States*, 279 U.S. 151, 155, 49 S.Ct. 291, 73 L.Ed. 647 (1929); *YMCA v. Davis*, 264 U.S. 47, 50, 44 S.Ct. 291, 292, 68 L.Ed. 558 (1924). In *Ahmanson*, the leading case in the line and incidentally the one with facts closest to those of the present case, the owner of all 100 shares of the common stock of a corporation, consisting of one share of voting stock and 99 shares of nonvoting stock, bequeathed the nonvoting stock to a charitable foundation and the single voting share in trust for his son. The district court discounted the value of the nonvoting stock because of its lack of voting rights, but the court of appeals reversed and held that the 100 shares should be valued as a unit representing full ownership and control of the corporation.

*Ahmanson* is in some tension with *Estate of Bright v. United States*, 658 F.2d 999 (5th Cir.1981) (en banc), and cases following it such as *Estate of Andrews v. Commissioner*, 79 T.C. 938, 953–56 (1982), and *Ward v. Commissioner*, 87 T.C. 78, 106–09 (1986). All of these cases reject what is called the "family attribution" doctrine. See generally Comment, *Estate of Bright and Propstra: Rejection of Family Attribution in Estate Valuation*, 2 Va. Tax.Rev. 357 (1983). In *Estate of Bright*, a husband and wife owned 55 percent of a corporation's stock as community property, signifying joint ownership until the community was dissolved by death or divorce. The wife died, leaving her shares in trust for their children, with the husband as trustee. The court refused to allow the government to value the shares in the trust as part of a control bloc. It held that they should be valued as if Mrs. Bright had left them to a stranger, thus destroying the bloc. Yet the shares had been worth more than that at the instant before transfer, that is, before her death, because they were then part of a control bloc; so under

*Ahmanson* one might have expected them to be valued at the higher rate.

*Ahmanson* does not discuss *Estate of Bright*; and although *Foltz v. U.S. News & World Report, Inc.*, 663 F.Supp. 1494, 1525 (D.D.C.1987), says that the two lines of cases are easily reconciled, the court does not make clear the basis of its confidence. Nor do we get much help from being told that "brief as is the instant of death, the court must pinpoint its valuation at this instant"—the much-cited but enigmatic formulation in *United States v. Land*, 303 F.2d 170, 172 (5th Cir.1962), relied on in *Estate of Bright*, see 658 F.2d at 1001–02. At the instant of Mrs. Bright's death, two offsetting events occurred; her shares were freed up from the restrictions imposed by community-property law that had created the control bloc of her and her husband's shares, *and* the shares came into the hands of Mr. Bright as trustee of the trust created by her will, thus reimposing the restrictions. Yet the court refused to consider the restrictions.

What the two lines of cases—inconsistent though they well may be in an important sense—have in common is an unwillingness to take into account, for purposes of valuation, terms or restrictions in the instrument of transfer itself. (In contrast, restrictions imposed before transfer are taken into account, provided they are not motivated by a desire to avoid gift or estate tax. See, e.g., *Estate of Bischoff v. Commissioner*, 69 T.C. 32, 39–40 (1977); *Estate of Littick v. Commissioner*, 31 T.C. 181, 185–86 (1958). We consider the rationale for distinguishing between transfer and pre-transfer restrictions later in this opinion.) Strip away the restrictions in Mrs. Bright's will, and the transfer in *Estate of Bright* was of shares that by virtue of Mrs. Bright's death were severed from her husband's, thereby destroying the control bloc. Strip away the term in Ahmanson's will splitting his corporate interest into two units, and the transfer was of the full ownership and control of the corporation. And strip away the restrictions in the trusts of the Curran siblings and what is left are unencumbered shares at the moments of transfer (respectively Cecilia's

death and the passing of the deadline for revoking the brothers' donations to the trusts). It is an accident, on this view, that in *Estate of Bright* the restrictions enhanced the value of the shares and that here they decreased it.

The principle that we find animating these otherwise diverse cases—that the taxable value of a gift is not altered by the terms of the conveyance—may appear necessary (as the court in *Ahmanson* believed, see 674 F.2d at 768) to prevent the following kind of facile avoidance of gift or estate tax, although we warn the reader that our effort at rationalization will turn out to be only a partial success. Suppose the owner of a tract of land ripe for commercial development and worth $1 million under single ownership makes a will dividing the tract into three parcels and bequeathing one to each of his adult children. The tract is less valuable as three units than as one, and let us say that the value of each one-third is only $300,000. But then the legatees get together and sell their parcels as a single unit for $1 million. (It might seem that if such a transaction is feasible each parcel must really be worth $333,-333.33. But this reasoning ignores transaction costs, which may be substantial if the parcels are in the hands of strangers, negligible if they are in the hands of family members.) If the estate is allowed to value the land on a divided basis (i.e., at $900,-000), it will escape tax on 10 percent of the actual value of the legacies. See *Estate of Pudim*, 44 T.C. Memo. 1982–606, at p. 1427 (1982), aff'd without opinion, 742 F.2d 1433 (2d Cir.1983).

The trick may have succeeded in *Whittemore v. Fitzpatrick*, 127 F.Supp. 710 (D.Conn.1954), where the owner of all 820 shares of the stock of a corporation gave 200 shares to each of his three sons, and the court refused to include a control premium in its valuation of the gifts. There is, however, a distinction between that case and our hypothetical case. The gifts were of equal shares in a corporation, and it was speculative whether the donees (the grantor's children) would pull together, or, as is not uncommon in closely held corporations,

pull apart. Since it is hard to sell stock in a closely held corporation to outsiders, there may be no easy solution if the siblings bicker. But in our hypothetical case the siblings own parcels in a tract of land, and the parcels can be combined, and the land sold as a unit, without great difficulty. How solid is this distinction, though? For the aggregate market value of the separate parcels of land to be worth much less than the market value of the land as a single tract, the transaction costs of assemblage into a single tract must be considerable; and even if the cost would be greater for strangers than for family members, the possibility of bickering and dissension within a family can never be excluded. So what we described earlier (following *Ahmanson*) as a facile mode of tax avoidance might actually be a risky, and therefore self-limiting, tactic.

In *Whittemore* as in our hypothetical case be reconciled with *Estate of Bright*? tion would have required a speculative prediction of the siblings' behavior, while in the present case acceptance of the government's position enabled the Tax Court to elide the issue of what might have happened after the trusts became irrevocable. The government is asking us to ignore the terms of the trust and determine how much the shares would have been worth if sold instead. It is trying to simplify the analysis, not complicate it, as it was trying to do in *Whittemore*.

But can the Tax Court's decision in this case be reconciled with *Estate of Bright*? Is that not the same case as our hypothetical case, which the court in *Ahmanson* thought the taxpayer must lose? Before Mrs. Bright died, her shares possessed a special value by virtue of being part of a control bloc, and after she died they still did, by virtue of the terms of the trust; yet for estate-tax purposes this special value was ignored. There is a difference: tax avoidance in the hypothetical case requires cooperation among the heirs, which is a chancy thing as we have said, while once Mrs. Bright willed her interest to a trust of which her husband was the trustee (and of course at the moment of death the will became irrevocable) all chanciness van-

ished. But this difference seems to make *Estate of Bright* as strong a case for the government as *Ahmanson*!

The court in *Estate of Bright* may have been unduly fixated on the possibility that Mrs. Bright might, right up to the date of death ( = transfer), have changed her will to bequeath her shares on terms that would have terminated the control bloc. But, for good or ill, that possibility is exactly analogous to the possibility that Cecilia Simon would have sold her shares to a stranger. If we uphold the Tax Court, the cases are symmetrical, seemingly the only difference being that here the assumption of a possible sale to a stranger results in a higher rather than lower valuation of the shares transferred. This is not *really* the only difference, of course; the analysis that generates it has undeniably a casuistic flavor in view of the possibility of tax avoidance in *Estate of Bright*. That decision seems driven by an overmastering desire for simplicity, achieved by always valuing a transfer as if the parties were strangers rather than members of the same family or otherwise entangled in a web of relationships that might change the actual value of the gift in either direction. Admittedly this is the sense of Treasury Regulation 20.2031–1(b), on which the government relies in this case and the taxpayers relied in *Estate of Bright*, and which requires that a transfer be valued as if it had been between a "hypothetical" seller and a "hypothetical" buyer, rather than between the actual parties. The concern with simplicity is made explicit in *Propstra v. United States*, 680 F.2d 1248, 1252 (9th Cir. 1982), yet seems exaggerated in *Estate of Bright* itself, where Mrs. Bright's will created the trust that assured the continuation of the control bloc after her death.

■ Although we hold that restrictions imposed in the instrument of transfer are to be ignored for purposes of making estate or gift tax valuations (whether in all cases, or only in cases such as *Ahmanson* where the restriction depresses rather than enhances the value of the property transferred, we need not decide), it remains to consider whether this principle applies in

this case. For here, unlike our hypothetical case, the donor did not insert a provision in the instrument of transfer that was designed to break up a single gift into parts worth in sum less than the whole. Indeed, there was not a single donor, but four donors, each of whom gave all of his or her voting stock. Moreover, the purpose of the maneuver, so far as we can tell from the record, was not to depress the market value of the stock (both voting and nonvoting)—though that was an effect—but to perpetuate family control over the corporation for as long as the Rule Against Perpetuities would permit. A purchaser of the stock of one of the siblings would have taken into account the fact that 75 percent of the company's voting stock either had been or was about to be placed in the irrevocable control of John and William Curran and their successors for the next century and that this control would probably be used to prevent the corporation from paying significant dividends. Knowing all this, the purchaser would have paid less (how much less, we need not consider) than if the remaining stock had not been (or was not about to be) so encumbered.

The argument might be unanswerable—so at least the government's counsel tentatively conceded at argument—if each of the settlors had been acting independently. Suppose that Cecilia Simon, rather than establishing a trust in concert with her siblings, had, all on her own, willed her voting stock to a corporate gadfly. Nobody (including a "hypothetical" buyer) considering the purchase of one of the remaining 25 percent blocks of stock after May 11, when the bequest would have become irrevocable, would have disregarded the possible adverse effect on corporate profitability of having to cope with a determined and articulate foe of corporate enterprise on the board of directors. We know of no principle of tax law that would authorize the Internal Revenue Service to ignore such a legacy in valuing shares that passed on May 27, if it had been made. See *Estate of Bright v. United States, supra,* 658 F.2d at 1007–08. But the facts are different. The four shareholders who among them owned the whole company acted to-gether in setting up identical trusts designed to perpetuate family control of the enterprise. Cf. *Blanchard v. United States,* 291 F.Supp. 348, 351 (S.D.Ia.1968). It is not exactly, but almost, as if there had been a single owner who by the instrument of transfer created four separate trusts, and we know from *Ahmanson* that in that event the stock would be valued as if he had created no trusts but simply had sold all of his stock in an arm's length transaction, since at the moment before transfer he could have sold them thus.

Unless the same approach is followed in a case like this, shareholders in family-owned corporations (which are legion) will have a brand-new tax incentive to depress the market value of their property by placing their stock in long-term irrevocable trusts. There is no evidence that this was the Curran family's motive; almost certainly it was not their only motive; but the decisions that require that a gift of property be valued in the transferor's hands rather than in the transferee's hands do not require proof of a tax motive. And we can hardly disregard the incentive that reversing the Tax Court in this case would create to restructure family corporations along the lines pioneered by the Currans.

Compare the situation of the siblings on May 27 with the situation each one of them would have been in on that day if Cecilia Simon had revoked her 76–1 trust and bequeathed her voting stock to a corporate gadfly, all without prearrangement with her brothers and sister. Then the depressive effect on the market value of their stock due to the gadfly's entry into the corporation would have been a condition beyond their control and in no way attributable to them: as external as a collapse of the market for one of the corporation's products. But, as it was, the depressive effect of Cecilia Simon's trust (once the trust was irrevocable) was a condition desired and procured by the siblings.

This is not to suggest that a donor can never gain a tax advantage from acts intended by him to depress the value of the gift. If you own the Mona Lisa and paint (indelibly) a mustache on it before giving

the painting to your child, with the result that its value is greatly reduced, still your gift tax will be computed at the reduced value. Maybe that is how *Whittemore* is to be understood. Or maybe it simply was wrongly decided, not because the court should have tried to estimate the probability of the heirs' getting together and reassembling their father's control bloc but because the 600 shares should have been valued as if sold to a hypothetical buyer, who would pay a premium for control.

The same result as in our Mona Lisa case would follow in a case where the owners placed restrictions on their stock by agreement and the restrictions took effect before a transfer that was subject to gift or estate tax. In both types of case the reduction in value would have occurred before the gift was made. Here the reduction in value was brought about by the trust instruments themselves, that is, by the transfers. The difference is not a purely technical one though it could be in some cases. If the siblings had imposed restrictions on their stock in an agreement that took effect before they transferred it, the restrictions would reduce the value of the stock in their hands (as in the Mona Lisa case, too), not just in the hands of their donees. This would make it a more costly method of reducing the market value of the stock when and if transferred than would be deferring the restriction until the stock was no longer theirs. Hence, as we noted earlier in a different context, it would be a self-limiting tactic; and hence it would have less appeal as a method of avoiding taxes. We need not decide when if ever a restriction imposed before transfer (a day before? an hour before?) should be considered for gift or estate tax purposes as part of the transfer itself.

We have been speaking thus far of the effect of the terms of Cecilia Simon's trust on a hypothetical purchaser of one of the other 25 percent slices of the nonvoting stock. But the analysis is the same if we imagine the effect of the other trusts on her. Suppose that instead of bequeathing her shares to a corporate gadfly she had sold them on the open market the day before her death (that is, at a time when all the trusts were still revocable). The price she would have received would have been depressed by the difficulty the purchaser would face in obtaining control of the corporation once the other trusts became irrevocable and by his poor prospects for receiving substantial dividends. If the depressed price had not been due to the terms of trusts identical to hers and created, with her consent, as part of a package of identical trusts, then the low price that such a hypothetical purchaser would have paid would fix the value of her shares for purposes of estate tax. But the depressive effect of the other trusts must in our view be attributed to her, because the four siblings acted as one in setting up the package of trusts.

The taxpayers have a fallback position. They say they should have been allowed to introduce rebuttal evidence that would have shown that the government expert's suggested discount of 20 percent for lack of marketability was too low. They say they didn't know that the expert was going to disregard the trusts and therefore were not prepared to meet him on his own ground. But it must have been obvious from the expert's report which the government gave the taxpayers before trial that the government's expert was not going to pay any attention to the trusts and that this might be the reason for the low discount. The taxpayers (as their own pretrial memorandum reveals) were not surprised. They staked their all on the theory that the value of each settlor's shares was a function of the restrictions placed by the trusts on the other settlors' shares; they lost the throw and are not entitled to another chance with another theory.

AFFIRMED.