ESTATE OF Charles K. McCLATCHY; William K. Coblentz and James McClatchy, personal representatives, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 97–70128.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 10, 1997.

Decided June 26, 1998.

Jonathan R. Bass, Keith Evans–Orville, Coblentz, Patch, Duffy & Bass, LLP, San Francisco, California, for petitioners-appellants.

Bruce R. Ellisen, Thomas V.M. Linguanti, Department of Justice, Tax Division, Washington, DC, for respondent-appellee.

Before: D.W. NELSON and TASHIMA, Circuit Judges, and ZILLY, District Judge.*

Opinion by Judge TASHIMA; Dissent by Judge D.W. NELSON.

TASHIMA, Circuit Judge:

Appellants (collectively, the "estate") appeal the Tax Court's determination of a $1,719,411 deficiency in estate tax due from the estate. The estate contends that the Tax Court incorrectly held that stock owned by the decedent, Charles K. McClatchy ("McClatchy" or "decedent"), should be valued without regard to federal securities law restrictions on marketability that applied to McClatchy during his lifetime, but do not apply to the estate. We have jurisdiction pursuant to 26 U.S.C. § 7482, and we reverse.

## I. STANDARD OF REVIEW

■ The valuation of stock is generally a question of fact, reviewed for clear error. *See Trust Servs. of Am., Inc. v. United States,* 885 F.2d 561, 568 (9th Cir.1989). This case, however, was submitted on stipulated facts, raising only a question of law; therefore, we review de novo. *See Sacks v. Commissioner,* 69 F.3d 982, 986 (9th Cir. 1995); *Vukasovich, Inc. v. Commissioner,* 790 F.2d 1409, 1411 (9th Cir.1986).

* The Honorable Thomas S. Zilly, United States District Judge for the Western District of Washington, sitting by designation.

## II. BACKGROUND

McClatchy was Chairman of the Board, Chief Executive Officer, and Editor of McClatchy Newspapers, Inc. (the "corporation") at the time of his death in 1989. The corporation had two classes of common stock: (1) Class A, which was publicly traded; and (2) Class B, which was not publicly traded, was convertible into Class A stock, and was subject to transfer restrictions set forth in a stockholders' agreement. McClatchy owned more than 2 million shares of Class B stock at the time of his death and had held them for more than three years. Because of his position with the corporation and his ownership interest, McClatchy was subject to federal securities law restrictions on the sale or distribution of his Class B shares as an affiliate of the corporation. See 17 C.F.R. § 230.144. These restrictions limited the marketability of McClatchy's shares, resulting in a value of $12.3375 per share before his death.

Upon McClatchy's death, however, the shares passed to the estate, which was not an affiliate of the corporation. The estate therefore was not subject to the securities law restrictions applicable to decedent. The parties agree that, apart from the restrictions, the fair market value of the stock was $15.56 per share.

The estate filed an estate tax return with the Internal Revenue Service ("IRS") reporting the stock's value as $12.3375 per share, for a total value of more than $25 million. The Commissioner of Internal Revenue ("Commissioner") issued a notice of deficiency, valuing the stock at more than $36 million, and assessing a deficiency of $5,784,910 and a penalty of $1,156,982. Following a challenge by the estate, the IRS conceded that a "blockage discount" of 15 percent should be used in valuing the stock, and that no penalties were due.[1] The parties agreed that the sole remaining disagreement was whether the stock should be valued subject to the federal securities law restrictions which had applied to decedent, but did not apply to the estate.

Following submission on stipulated facts and issues, the Tax Court held that, because "the securities law restrictions evaporated at the moment of death, ... the shares must be valued free of the restriction, at $15.56 per share." *Estate of McClatchy v. Commissioner*, 106 T.C. 206, 214, 1996 WL 149702 (1996). The court entered a decision determining an estate tax deficiency of $1,719,411 from which the estate appeals.

## III. DISCUSSION

■ The federal estate tax is a tax on "the transfer of the taxable estate of ... decedent." 26 U.S.C. § 2001(a); *see also United States Trust Co. v. Helvering*, 307 U.S. 57, 60, 59 S.Ct. 692, 83 L.Ed. 1104 (1939) ("[A]n estate tax is not levied upon the property of which an estate is composed. It is an excise imposed upon the transfer of or shifting in relationships to property at death."); *Ithaca Trust Co. v. United States*, 279 U.S. 151, 155, 49 S.Ct. 291, 73 L.Ed. 647 (1929) ("The tax is on the act of the testator not on the receipt of property by the legatees."); *Young Men's Christian Ass'n v. Davis*, 264 U.S. 47, 50, 44 S.Ct. 291, 68 L.Ed. 558 (1924) ("*YMCA*") ("What this law taxes is not the interest to which the legatees and devisees succeeded on death, but the interest which ceased by reason of the death."). The value of the estate includes "the value of all property to the extent of the interest therein of the decedent at the time of his death." 26 U.S.C. § 2033. At issue is whether the stock is to be valued in the hands of the decedent or the estate for estate tax purposes.

■ There is no question that the estate tax is on the transfer of property at death and that, therefore, the property to be valued is the interest transferred at death, "rather than the interest held by the decedent before death or that held by the legatee after death." *Propstra v. United States*, 680 F.2d 1248, 1250 (9th Cir.1982) (citing *Estate of Bright v. United States*, 658 F.2d 999, 1001 (5th Cir.1981) (en banc)). However, the Commissioner argues that, because the stock was transferred to a non-affiliate estate upon McClatchy's death, this is one of those rare

---

1. A blockage discount refers to the likelihood that liquidation of a large block of stock would reduce the stock's selling price. *See* 26 C.F.R. § 20.2031–2(e).

cases in which death itself alters the value of the property. *See McClatchy*, 106 T.C. at 214 (reasoning that the stock transferred "at the moment of death and passed to the decedent's estate," causing the securities laws restrictions to "evaporate[ ] at the moment of death"). According to the Commissioner, then, the stock is to be valued at its higher value in the hands of the non-affiliate estate because the property was transformed prior to distribution to the estate.

The Commissioner relies on *Ahmanson Found. v. United States*, 674 F.2d 761, 767–68 (9th Cir.1981), and similar cases where death itself alters the value of the decedent's property. In *Ahmanson*, the decedent held, through a revocable trust, a controlling interest (600 shares) in voting common stock of HFA, a holding company which owned 81 percent of the stock of Home Savings & Loan Association. Also in the trust were all 100 shares (99 nonvoting and one voting share) of Ahmanco, a corporate shell with no assets prior to the decedent's death. At the moment of death, Ahmanco became unconditionally entitled to the 600 shares of voting HFA common stock, pursuant to declarations of trust. Under the same declarations, Ahmanson Foundation, a charitable organization, became entitled to the 99 nonvoting shares of Ahmanco, and the voting share remained in the control of Ahmanson's family. The court stated that valuation must "take into account any transformations of the property that are logically prior to its distribution to the beneficiaries," and so the Ahmanco shares were to be valued based on the 600 shares of HFA that passed at death. *Id.* at 767. The court noted that, although death itself does not usually alter the value of property owned by the decedent, in some instances, such as in the death of a key partner, death might change the value. *Id.* at 768 (citing *United States v. Land*, 303 F.2d 170, 172 (5th Cir.1962)).

The Foundation argued that the Ahmanco shares should be split into two blocks for valuation, with its 99 nonvoting Ahmanco

shares valued separately from the voting share. *Id.* The court declined to value the nonvoting shares separately from the voting share, reasoning that " 'predistribution' transformations and changes in value brought about by the testator's death [must be distinguished] from changes in value resulting from the fact that under the decedent's estate plan the assets in the gross estate ultimately come to rest in the hands of different beneficiaries." *Id.* The court therefore concluded that the 100 shares should be "viewed in the hands of the testator," not as two separate assets, because "nothing in the statutes or in the case law ... suggests that valuation of the gross estate should take into account that the assets will come to rest in several hands rather than one." *Id.* at 768–69.

In *Land*, a partnership interest was restricted to two-thirds of its value during the partner's lifetime, but upon death, the surviving partners had to pay full value in order to purchase the interest. Because death "sealed the fact" that the interests would be purchased at full value, the court ruled that the full value controlled for estate tax purposes. 303 F.2d at 175. In *Goodman v. Granger*, 243 F.2d 264 (3d Cir.1957), another case on which the Commissioner relies, an employment contract provided for the payment of benefits after the termination of employment, dependent upon contingencies which could cause forfeiture of the payments. Upon the employee's death, however, the possibility of any of the contingencies occurring was extinguished. The court reasoned that "[d]eath ripened the interest in the deferred payments into an absolute one;" consequently, the estate tax was measured by "the value of that absolute interest in property." 243 F.2d at 269.

■ In these cases, death clearly is the precipitating event and is the only event required to fix the value of the property. Similarly, the death of a key partner can instantly decrease the value of a business. *See Ahmanson*, 674 F.2d at 768.[2] But in the

---

**2.** The Commissioner relies on another example in *Ahmanson* to argue that valuation depends on the assets that the estate in fact receives. However, the case cited by *Ahmanson* does not posit

that assets are to be valued based on what the estate receives after the directives of the will are carried out. *See Provident Nat'l Bank v. United States*, 581 F.2d 1081, 1086 (3d Cir.1978). Rath-

instant case, death alone did not effect the transformation in the stock's value. The value of the stock was transformed only because the estate was a non-affiliate. Thus, contrary to the Commissioner's assertion, the property was not transformed prior to distribution to the estate. If the estate had been an affiliate, the securities law restrictions still would have applied. *See* 17 C.F.R. § 230.144(e)(3)(v) (setting forth restrictions on sale of securities by an affiliate estate but providing no limitation for a non-affiliate estate).

The affiliate or non-affiliate status of an estate depends on the status of the executor or other person who serves "in any similar capacity." 17 C.F.R. § 230.144(a)(2)(ii). The personal representatives for the estate were not issued letters testamentary until 25 days after McClatchy's death. The restrictions therefore did not evaporate at the moment of death.

Making the amount of estate tax dependent on the affiliate or non-affiliate status of the executor contradicts the principle that valuation should not depend on the status of the recipient. *See Estate of Bonner v. United States*, 84 F.3d 196 (5th Cir.1996) (the fact that decedent held a partial interest in property whose remaining interest was held in a trust that was included in decedent's estate did not allow the interests to be merged for 100% ownership of the assets by the estate); *Ahmanson*, 674 F.2d at 768 ("To take into

account for valuation purposes the fact that the testator's unitary holding has become divided in the hands of two or more beneficiaries, would invite abuse."); *Bright*, 658 F.2d at 1006 ("It would be strange indeed if the estate tax value of a block of stock would vary depending upon the legatee to whom it was devised.").

The Commissioner attempts to distinguish the present case by differentiating between distribution to the estate and to beneficiaries or legatees, but the authorities he cites do not support his contention. In fact, in *Bright*, the court rejected the government's argument that the decedent's husband's identity as executor and trustee was relevant to valuation of the estate.[3] *Id.* at 1002–07.[4] Furthermore, the *Land* and *Ahmanson* line of cases does not distinguish between transfer to the estate and transfer to beneficiaries or legatees, as the Commissioner suggests.

The Commissioner's position would lead to the following anomaly described by the estate in its brief: Taxpayer A, an affiliate, and Taxpayer B, a non-affiliate, each own $1,000,000 worth of stock, but because of the securities laws restrictions, Taxpayer A's shares are worth only $800,000. Taxpayer A's estate plan uses non-affiliate executors, while Taxpayer B's uses affiliate executors. Thus, when Taxpayer A dies, his $800,000 interest is worth $1,000,000 to his estate, whereas Taxpayer B's $1,000,000 interest is worth $800,000 to his. The result is that, by using

---

er, the court stated that "[t]he correct value for tax purposes is not the value after the directives are implemented but the present value at the time of death, when the will becomes operative and the interest in property becomes subject to future directives." *Id.* (footnote omitted). Similar to *Land, Goodman*, and *Ahmanson*, the court reasoned that changes in value which are occasioned by death itself (whether because death fixes the value by extinguishing contingencies or because the decedent has directed certain changes to occur upon death) should be taken into account in valuing the property. These directives are occasioned solely by the testator's death and alone fix the value of the property. By contrast, the affiliate or non-affiliate status of McClatchy's estate and, therefore, the value of the stock, are not determined solely by the decedent's death.

**3.** The dissent argues that *Bright* is inapposite because it "exclusively addressed the contrast

between the pre-death moment and the post-distribution moment." Dissent at 1096. While *Bright* did address the pre-death and post-distribution moments, it also addressed the government's argument regarding the husband's status as executor of the estate. *See Bright*, 658 F.2d at 1002. The passage quoted by the dissent discussed the husband's status as trustee, post-distribution, but the court clearly also considered his status as executor, before distribution to the trust. *See id.* at 1002 (rejecting any family attribution based on the husband's identity "as executor or trustee"), 1006 ("the 'willing seller' cannot be identified with Mr. Bright as executor or as trustee").

**4.** The government in *Bright* was relying on a family attribution theory, but the court's analysis and conclusion apply as well where the decedent and executor do not belong to the same family.

affiliate executors, a non-affiliate decedent, who transfers a more valuable asset than an affiliate decedent, pays less estate tax than the affiliate decedent.

We also note that the Commissioner's argument in this case contradicts the position he took in *Citizens Bank & Trust Co. v. Commissioner*, 839 F.2d 1249 (7th Cir.1988). In *Citizens Bank*, four siblings who owned 25 percent each of a family corporation placed their stock in identical trusts which became irrevocable after 20 days or upon death of the settlor. One of them died within four days, and in valuing the stock for estate tax and gift tax purposes, the taxpayers argued for a 90 percent marketability discount due to restrictions placed on the stock by the irrevocability of the trusts. The court rejected this claim and accepted the government's argument that the stock should be valued without regard for the trusts. *Id.* at 1250, 1253–55. The court stated that the government was relying "on a line of cases that infer ... that value is to be measured at the instant before transfer, so that the amount of tax depends on the value of the transferred property *in the hands of the transferor* rather than its value in the hands of the transferee." *Id.* at 1251 (emphasis added). In *Citizens Bank*, the reduction in the stock's value was brought about by the trust instruments themselves, by the transfer of the stock to the trust effected by death. *See id.* at 1255. Yet, the government argued, and the court agreed, that the stock should be valued before the transfer, in the testator's hands.

The Tax Court's holding contravenes the general principle that "[t]he tax is measured by the value of assets transferred by reason of death, the critical value being that which is determined as of the time of death." *Goodman*, 243 F.2d at 269, *quoted in McClatchy*, 106 T.C. at 214. At the time of death, the stock belonged to McClatchy, an affiliate of

the corporation, depressing their value to that reported by the estate. The Tax Code itself defines the value of the estate for estate tax purposes to include "the value of all property to the extent of the interest therein of the *decedent* at the time of his death." 26 U.S.C. § 2033 (emphasis added); *see also YMCA*, 264 U.S. at 50, 44 S.Ct. 291 (estate tax is on "the interest which ceased by reason of the death").[5]

Finally, the Commissioner's contention that the hypothetical "willing buyer willing seller" method of determining fair market value is determinative begs the question. *See* 26 C.F.R. § 20.2031–1(b) ("The fair market value [of property in a decedent's estate] is the price at which the property would change hands between a willing buyer and a willing seller...."). The Commissioner argues that valuation depends on the hypothetical buyer purchasing the stock not from decedent but from the estate.

■ However, the "willing buyer willing seller" method posits not only a hypothetical buyer, but also a hypothetical seller. *See Propstra*, 680 F.2d at 1251–52 (willing seller is hypothetical seller rather than the estate); *Bright*, 658 F.2d at 1006 (willing seller is hypothetical). In *Propstra*, we rejected the government's claim that an undivided one-half interest in real property should be valued as if it would be sold with the other half, stating, "[t]he use of an objective standard avoids the uncertainties that would otherwise be inherent if valuation methods attempted to account for the likelihood that estates, legatees, or heirs would sell their interests together with others who hold undivided interests in the property." 680 F.2d at 1252. The court thus stated that fair market value should be defined by both buyers and sellers that are hypothetical. *See id.*

5. The dissent argues that the estate tax is assessed against the decedent's estate, not against the decedent. Dissent at 1095. While this is true, 26 U.S.C. § 2033 clearly states that the *value* of the estate is measured by the interest of the *decedent* at the time of his death. The dissent also quotes *Estate of Curry* as holding that property is to be valued in the hands of the estate. Dissent at 1095. What *Curry* actually states, however, is that "property is to be valued as it

exists in the hands of the estate *rather than* as it might exist if subsequently divided." 706 F.2d at 1429 (emphasis added). *Curry*, therefore, is distinguishing between the value in the hands of the estate and the value as subsequently divided among legatees. Its statement regarding when the property is to be valued is not relevant to the issue we are addressing here, which distinguishes between the value in the hands of the decedent and the hands of the estate.

In the instant case, the identity or status of that hypothetical seller is the very issue. We therefore agree with the estate that the "willing buyer willing seller" test "offers no guidance" in this case, especially since the parties agree on figures for fair market value, and the only question is which figure to accept.

## IV. CONCLUSION

The increase in the stock's value was occasioned, not by death, but by transfer to a non-affiliate estate; death alone did not alter the value. Moreover, the value of the estate is determined by the interest of the decedent at the time of death. Therefore, the stock should be valued in the hands of the decedent. The decision of the Tax Court is **REVERSED,** with directions to enter a decision for the estate.

D.W. NELSON, Circuit Judge, dissenting:

As the majority recognizes, the sole issue for consideration in this case is whether the Tax Court erred in holding that the securities law restrictions that attached to shares of stock owned by McClatchy during his lifetime did not affect the federal estate tax liability of McClatchy's estate. Because I believe that the Tax Court's decision was correct, I respectfully dissent from the majority's opinion.

The federal estate tax is not assessed against the decedent, but against the decedent's estate. *See* 26 U.S.C. § 2001(a) ("A tax is hereby imposed on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States."); *Estate of Curry v. United States,* 706 F.2d 1424, 1429 (7th Cir.1983) (holding that for estate tax purposes "property is to be valued as it exists in the hands of the estate"). In my view, it follows that McClatchy's stock was properly valued as it existed in the hands of his estate, rather than as it existed in his own hands. The Tax Court therefore did not err in deciding that the securities restrictions, which attached to the shares while in McClatchy's possession, vanished at the moment of death when the shares passed from McClatchy, an affiliate subject to the restrictions, to his non-affiliate estate.

As the Tax Court explained in its opinion, *Ahmanson Foundation v. United States,*

674 F.2d 761 (9th Cir.1981), is directly on point. In *Ahmanson,* this court distinguished between "pre-distribution" and "post-distribution" transformations in the value of a decedent's property. In the words of the *Ahmanson* court:

Ordinarily death itself does not alter the value of property owned by the decedent. However, in a few instances ... death does change the value of property. The valuation should ... take into account transformations brought about by those aspects of the estate plan which go into effect logically prior to the distribution of property in the gross estate to the beneficiaries.

*Id.* at 768 (citations omitted). Applying the logic and language of *Ahmanson* to the instant case, McClatchy's death altered the value of his property by causing the shares to be passed to his non-affiliate estate, thereby voiding the restrictions that had previously attached on account of McClatchy's affiliate status. As in *Ahmanson,* the transformation at issue here—the lapse of the securities restrictions—went into effect prior to the distribution of McClatchy's property to his beneficiaries. Under *Ahmanson,* this pre-distribution transformation must be considered in determining McClatchy's estate tax liability.

The hypotheticals offered by the *Ahmanson* court to illustrate the difference between pre-distribution and post-distribution transformations in a decedent's property fully support the Tax Court's decision. For example, the *Ahmanson* court posed the following scenario: "[I]f a public figure ordered his executor to shred and burn his papers, and then to turn the ashes over to a newspaper, the value to be counted would be the value of the ashes, rather than the papers." *Id.* Here, McClatchy's estate plan ordered that the stock be transferred to his executors prior to being distributed to his beneficiaries. Like the papers in the *Ahmanson* example, the stock should be valued in the aftermath of the pre-distribution transformation, free of the restrictions that attached while the stock was still in McClatchy's possession.

The majority reasons that whereas the property transformation in the *Ahmanson*

"ashes" example was occasioned by "death alone," the property transformation in the case at bar was occasioned by the non-affiliate status of decedent's estate. Given that the papers in the *Ahmanson* hypothetical were not burned and shred as a direct result of the decedent's death, but rather as the result of an order contained within the estate plan, I find the majority's distinction unconvincing.

Moreover, I believe that the Fifth Circuit's opinion in *United States v. Land*, 303 F.2d 170 (5th Cir.1962), which the majority cites in support of its decision, only bolsters the Tax Court's reasoning. The *Land* court held that in determining the federal estate tax, restrictions applicable by virtue of the decedent's status in life must be disregarded:

> To find the fair market value of a property interest at the decedent's death we put ourselves in the position of a potential purchaser of the interest at that time. Such a person would not be influenced in his calculations by past risks that had failed to materialize or by restrictions that had ended. Death tolls the bell for risks, contingencies, or restrictions which exist only during the life of the decedent.

*Id.* at 173. Here, McClatchy's death "tolled the bell" for the securities law restrictions that existed only during his lifetime. In the words of the Tax Court, the restrictions "evaporated at the moment of death."

McClatchy attempts to confuse the issue by obscuring the difference between the transfer to his estate and the subsequent transfer to his beneficiaries or legatees. McClatchy maintains, for example, that "[c]hanges in the value of an asset which occur by reason of the identity and status of the recipient, not death, must be ignored for estate tax purposes." McClatchy's use of the generic term "recipient" blurs the line between the estate and the ultimate beneficiary of the decedent's property interest. Of course, it is well-established that changes in value resulting from distribution to beneficiaries or legatees are not accounted for in determining the federal estate tax. *See, e.g., Ithaca Trust Co. v. United States*, 279 U.S. 151, 155, 49 S.Ct. 291, 73 L.Ed. 647 (1929). However, this court held in *Ahmanson* that there is a sharp distinction for estate tax purposes between pre- and post-distribution changes in the value of a decedent's property.

Because the proper focus in this case is on the difference between pre- and post-distribution changes in the decedent's estate, I believe that *Estate of Bright v. United States*, 658 F.2d 999 (5th Cir.1981), on which McClatchy and the majority rely, is inapposite. In that case, the Fifth Circuit held that property is to be valued for estate tax purposes in the hands of the estate, not in the hands of the legatee after distribution. The *Bright* court exclusively addressed the contrast between the pre-death moment and the post-distribution moment:

> [T]he fact that Mr. and Mrs. Bright held their stock during her lifetime as a control block of 55% is an irrelevant fact. It is a fact which antedates her death, and no longer exists at the time of her death. Dictum in *Land* also suggests that the post-death fact-that the estate's 27.5% will pass to Mr. Bright as trustee of the testamentary trust-is also irrelevant.

*Id.* at 1002. Concerned only with the periods pre-death and post-distribution, *Bright* does not involve a pre-distribution value transformation like the one at issue in the present case.

This case is one of the "few instances" where death itself—not distribution—changes the value of property owned by the decedent. *Ahmanson*, 674 F.2d at 768 ("[I]n a few instances ... death does change the value of the property."); *see also Land*, 303 F.2d at 172 ("It is only in the few cases where death alters value, as well as ownership, that it is necessary to determine whether the value at the time of death reflects the change caused by death...."). The majority resolves this case by relying on the familiar distinction between the estate tax (a tax on the passing of property) and the inheritance tax (a tax on the receipt of property by the decedent's beneficiaries). This case, however, does not at all concern the moment of distribution or inheritance. Rather, it involves a pre-distribution value transformation resulting from the passing of shares to the decedent's estate, and should be considered in accordance with other cases of its kind. The Tax Court properly considered

this pre-distribution transformation by assessing McClatchy's stock in the hands of his non-affiliate estate.

I respectfully dissent.