T.C. Memo. 2001-174


UNITED STATES TAX COURT


ESTATE OF MARVIN M. SCHWAN, DECEASED, LAWRENCE A. BURGDORF,
SPECIAL ADMINISTRATOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


THE MARVIN M. SCHWAN FOUNDATION, f.k.a. THE KING'S FOUNDATION,
TRANSFEREE OF A TRANSFEREE OF THE ESTATE OF MARVIN M. SCHWAN,
DECEASED, ALFRED PAUL G. SCHWAN AND LAWRENCE A. BURGDORF,
TRUSTEES, Petitioner <u>v</u>. COMMISSIONER OF INTERNAL REVENUE,
Respondent

Docket Nos. 21554-97, 21555-97.        Filed July 13, 2001.


        At the time of his death, D owned two-thirds of
the voting and nonvoting shares in SSE, a closely held
corporation.  D's estate plan provided for the
distribution of such shares to a charitable foundation
and for the subsequent redemption by SSE of certain of
the "securities" as defined in a redemption agreement.
The dispute between the parties in these cases centers
on the valuation of D's SSE stock for purposes of
computing the gross estate and the allowable charitable
deduction under Federal tax laws.  On petitioners'
motion for summary judgment and respondent's cross-
motion for partial summary judgment, <u>held</u>:

        (1) Because of potential impediments under State
law relating to stockholder rights, an alleged power on

the part of the foundation to recapitalize SSE after D's death and convert all nonvoting shares to voting shares is an insufficient basis on which to conclude, as a matter of law, that the value of the stock must necessarily be identical for gross estate and charitable deduction purposes.

(2) D's voting and nonvoting shares in SSE must be valued for gross estate purposes as a unitary, two-thirds interest, unrestricted by the terms of the redemption agreement. The requirement under D's estate plan that the SSE shares be distributed to the foundation, and that certain shares be redeemed by SSE, did not affect the value of the shares in the gross estate.

(3) The redemption agreement is ambiguous as to whether it required redemption of only the voting shares, as opposed to both the voting and nonvoting stock.

(4) The charitable deduction available to D's estate must be reduced by the burden of taxes and administrative expenses, and a bonus received by the estate after D's death cannot be taken into account in calculating such tax and expense burden.

Larry R. Henneman and Ann B. Burns, for petitioner in docket No. 21554-97.

Joseph M. Hassett, George H. Mernick III, and Albert W. Turnbull, for petitioner in docket No. 21555-97.

Lawrence C. Letkewicz, Marjory A. Gilbert, and William G. Bissell, for respondent.

MEMORANDUM OPINION

NIMS, Judge:  Respondent determined a Federal estate tax deficiency for the estate of decedent Marvin M. Schwan (the Estate) in the primary amount of $415,480,079 and in an alternative amount of $181,921,766.  In computing the primary deficiency, respondent determined that no deduction was allowable for a charitable bequest to the Marvin M. Schwan Foundation (the Foundation) because, due to "an unresolved controversy", the amount to be received by the Foundation had not been established to exceed the estate taxes payable from such bequest.  The parties now agree that the referenced controversy has been settled, and respondent has conceded this primary position.  Hence, only respondent's alternative position, which was based on the terms of decedent's estate plan without regard to the pending controversy, presently remains at issue.

By a separate notice of deficiency, respondent further determined that the Foundation was similarly liable for the foregoing deficiencies as a result of its transferee status.

Procedural Posture

These consolidated cases are before the Court on petitioners' motion for summary judgment and respondent's cross-motion for partial summary judgment.  Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect as of the date of decedent's death, and all Rule

- 4 -

references are to the Tax Court Rules of Practice and Procedure. Also, for convenience and because this matter involves multiple individuals sharing the same last name, we adopt the convention of using first names for subsequent references to previously identified persons.

Rule 121(a) allows a party to move "for a summary adjudication in the moving party's favor upon all or any part of the legal issues in controversy."  Rule 121(b) directs that a decision on such a motion may be rendered "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law."  The moving party bears the burden of demonstrating that no genuine issue of material fact exists and that he or she is entitled to judgment as a matter of law.  Estate of Chenoweth v. Commissioner, 88 T.C. 1577, 1578 (1987).  Facts are viewed in the light most favorable to the nonmoving party.  See id.  With respect to the case at bar, we set forth below factual information that, based upon examination of the pleadings, moving papers, responses, and attachments, would appear not to be in dispute.

Factual Background

Petitioners

Decedent died testate on May 9, 1993, in Poway, California. He was at that time a domiciliary of Sioux Falls, South Dakota, and his will was subsequently admitted to probate in the Circuit Court of Minnehaha County, South Dakota. Lawrence A. Burgdorf, a friend of decedent, was appointed by the circuit court as special administrator for purposes of the Estate's tax controversy with the Internal Revenue Service. The petitions filed in these cases provide a mailing address for Lawrence in St. Louis, Missouri. The Foundation is a section 501(c)(3) charitable entity established under the laws of South Dakota. Lawrence and Alfred Paul G. Schwan, decedent's brother, serve as the Foundation's trustees. Alfred used a mailing address in Salina, Kansas, at the time the petitions in these cases were filed.

Events Prior to May 9, 1993

Until his death on May 9, 1993, decedent was the president and majority shareholder of Schwan's Sales Enterprises, Inc. (SSE). SSE is primarily engaged in the production and distribution of frozen food products throughout the United States and Canada. SSE has at all relevant times been a closely held corporation organized under the laws of the Minnesota. Capitalization of SSE has also at all pertinent times been divided between voting common shares and nonvoting common shares.

On December 29, 1976, decedent created five irrevocable trusts and funded each with a portion of his SSE stock. One trust was established for the benefit of each of his four children: Lorrie L. Schwan (now Schwan-Okerlund), Mark D. Schwan, David J. Schwan, and Paul M. Schwan (collectively the Children's Trusts and individually, e.g., the Lorrie Irrevocable Trust). A fifth trust was established for decedent's grandchildren (the Grandchildren's Trust). Subsequently, on August 1, 1985, decedent executed a will and established a revocable trust which dealt, among other things, with the eventual disposition of his remaining interest in SSE.

Thereafter, on November 20, 1992, decedent executed a series of documents serving to amend and expand his estate plan. As relevant to the instant proceedings, these instruments included: (1) A new will superseding all prior wills; (2) a revocable trust altering and restating the trust established in 1985 (the 1992 Trust); (3) a charter creating the Foundation; and (4) a trust for the benefit of his great-great grandchildren (the 3G Trust). Decedent funded the 3G Trust with a portion of his SSE stock, and the remainder of his shares were apparently held through the 1992 Trust. Additionally, on November 25, 1992, decedent, the 1992 Trust, the Foundation, and SSE entered an agreement providing for the future redemption of certain SSE shares (the Redemption Agreement).

In general, pursuant to these instruments and as pertinent to the pending motions, decedent's estate plan was structured in the following manner. Decedent's will devised all stock in SSE owned by him at the time of his death to the trustees of the 1992 Trust. (We note, however, that while the parties do not discuss any specific date of transfer, the record seems to indicate that decedent's complete SSE holdings were in fact placed in the 1992 Trust prior to his death.) The trust agreement, in turn, directed that all SSE stock be distributed by the trustees outright to the Foundation. The Redemption Agreement then specified that, on the 10th business day after the due date for decedent's Federal estate tax return, SSE was to redeem the "Securities", as defined therein, from the Foundation for a purchase price equal to the value of the Securities as determined for Federal estate tax purposes. The Securities subject to the Redemption Agreement were defined to include:

> 1) Common or other Voting Capital Stock of the Company;
> 2) voting capital stock of any affiliate of the Company
> and 3) voting capital stock that is the product of any
> reorganization of the Company * * *

In this connection the Foundation charter also provided that the Foundation trustees:

> may vote stock or shares of any corporation or trust
> directly or by proxy in such manner as they deem
> advisable * * * . If the Foundation is a party to a
> redemption agreement with Schwan's Sales Enterprises,
> Inc., the Trustees shall perform said agreement, and
> shall not exercise their voting power hereunder so as
> to rescind it.

However, neither the 1992 Trust nor the Redemption Agreement restricted decedent's right to otherwise dispose of his interest in SSE.  The 1992 Trust by its terms reserved to decedent, as settlor, the right to amend or revoke the trust agreement during his lifetime.  The Redemption Agreement likewise stated:

> This Agreement shall not limit Schwan's freedom, during his lifetime, to sell, give away, create a security interest in or otherwise transfer the Securities without restriction, or, upon his death, to transfer the Securities and any additional securities received by him without restriction by bequest or gift outright or in trust. * * *

Subsequently, in December of 1992, the articles of incorporation of SSE were amended to increase the number of shares authorized, and a stock dividend of 100 nonvoting shares for each nonvoting share issued and outstanding was declared. The Redemption Agreement was amended on February 4, 1993, to reflect the appropriate numbers for the recapitalized structure and decedent's holdings therein.

### Events After May 9, 1993

Following decedent's death on May 9, 1993, it appears from the record that ownership of SSE was distributed as set forth below:

| Shareholder | Voting Shares | Nonvoting Shares |
| --- | --- | --- |
| 1992 Trust | 5,076 | 25,910,000 |
| 3G Trust | 1,270 | 0 |
| Grandchildren's Trust | 632 | 6,320,000 |
| Lorrie | 79 | 740,000 |

| | | |
|---|---|---|
| Lorrie Irrevocable Trust | 79 | 790,000 |
| Mark | 79 | 765,000 |
| Mark Irrevocable Trust | 79 | 790,000 |
| David | 79 | 740,000 |
| David Irrevocable Trust | 79 | 790,000 |
| Paul Irrevocable Trust | 158 | 1,530,000 |
| Trusts created by the Schwan children | 0 | 175,000 |
| TOTAL | 7,610 | 38,550,000 |

The relevant directors and officers of SSE as of that date were Alfred, Adrian J. Anderson, and Donald M. Miller. The record additionally reflects that, as of decedent's date of death, Alfred and Lawrence were the trustees of the 1992 Trust, the 3G Trust, and the Foundation. The trustees for the Children's Trusts and the Grandchildren's Trust appear to have been Alfred, Lawrence, and Elton Huebner. The named executors of the Estate were Lawrence, Mark, and Paul.

In December of 1993, the 5,076 voting and 25,910,000 nonvoting shares of SSE held by the 1992 Trust were transferred to the Foundation. Thereafter, on August 4, 1994, a document entitled "Amendment to Agreement" (the 1994 Amendment) was executed by Alfred and Lawrence in their capacities as trustees of the Foundation, by Alfred and Lawrence in their capacities as trustees of the 1992 Trust, by Lawrence in his capacity as executor of the Estate, and by Donald on behalf of SSE. The 1994 amendment recited:

- 10 -

>Questions and controversies have arisen between counsel for the Foundation and counsel for the Company regarding the interpretation of * * * the Redemption Agreement.  One interpretation would require the Company to purchase, and the Foundation to sell, all of the Shares.  Another interpretation would require the Company to purchase, and the Foundation to sell, only the voting shares.  The Foundation and the Company understand that it is uncertain how a court would resolve the varying interpretations of the Redemption Agreement.

The instrument then provided that the Foundation would sell, and SSE would purchase, all of the shares, both voting and nonvoting, at an initial purchase price of $869,450,800.

Also on August 4, 1994, decedent's Federal estate tax return was signed by Lawrence, Mark, and Paul.  The return was received by respondent on August 10, 1994.  Therein, decedent's SSE stock was valued at $869,450,800 in his gross estate, and a charitable deduction was taken in that same amount for the bequest of the shares to the Foundation.  Similarly, the above-referenced redemption transaction was completed on August 23, 1994, with the Foundation receiving cash and a note totaling $869,450,800.

After the foregoing events, in May of 1995, Lorrie, Mark, David, and Paul, individually and as parents of decedent's grandchildren, filed suit in the U.S. District Court for the District of Minnesota against SSE, the Foundation, Alfred, and Lawrence.  In their amended complaint, the plaintiffs brought numerous direct and derivative claims based principally on the contention that, under the Redemption Agreement, "Schwan's was to

redeem only the outstanding <u>voting</u> stock owned by the Foundation upon Marvin's death and not the <u>non-voting</u> stock." The plaintiffs alleged injury to their position as minority shareholders and trust beneficiaries on grounds including violation of statutory corporate law, fraud, breach of fiduciary duty, and conspiracy. This litigation eventually settled in November of 1997. Pursuant to the settlement reached, the redemption transaction remained in place, and SSE agreed to redeem as well the stock held by the plaintiffs for a price of nearly $160 million.

In the notice of deficiency sent by respondent to the Estate in August of 1997, respondent determined that the value of the SSE stock in decedent's gross estate was $1,064,591,322, an increase of $195,140,522 over the reported value. As relevant to the instant motions, respondent further determined that the fair market value of the SSE shares passing to the Foundation for purposes of the charitable deduction was $857,572,432, a decrease of $11,878,368 from the reported value.

<u>Discussion</u>

I.  <u>Petitioners' Motion for Summary Judgment</u>

A.  <u>Power To Recapitalize</u>

Petitioners move for summary judgment on the primary grounds that "the Foundation's power to convert the non-voting stock to voting stock gave it the same rights as were included in the

gross estate, and thus the Commissioner erred in assuming that the stock had a lower value for purposes of the charitable deduction than for purposes of the gross estate." As explained in greater detail below, it is respondent's position that decedent's holdings in SSE must be valued for purposes of the gross estate as a unitary, unrestricted two-thirds interest in the company. At the same time, because respondent construes the Redemption Agreement as providing for redemption of only voting stock, respondent views the interest bequeathed to the Foundation as consisting of the nonvoting shares and a right to payment for the voting shares following a transitory holding period. Respondent concludes that this bifurcated interest, as restricted by the Redemption Agreement, had a lesser fair market value than the unitary, unrestricted holding.

Petitioners, on the other hand, allege that even if the Redemption Agreement is interpreted to cover only the voting stock, such is irrelevant and does not diminish the value of the charitable gift. Petitioners reason that because the Foundation received from decedent sufficient voting shares to control SSE, the Foundation could exercise such control to recapitalize the corporation and thereby remove any distinction between the classes of stock. Since the Redemption Agreement required SSE to redeem voting stock that is a product of any reorganization at its value as determined for Federal estate tax purposes,

petitioners maintain that, as a matter of law, the Foundation received rights having the same value as those included in the gross estate. (In this connection, we note that while petitioners summarize their position in terms of the Foundation possessing the "same rights" as were included in the gross estate, their principal argument rests more particularly on the Foundation's receiving potentially nonidentical rights having the same value as those in the gross estate.)

Petitioners also raise the alternative point that even if a postrecapitalization redemption of shares not originally designated voting could be prevented or enjoined, the Foundation's power to recapitalize would in that event have enabled it to continue indefinitely in possession of a two-thirds interest in both the equity and the voting power of SSE, mirroring the interest held by decedent.

The parties are seemingly in agreement, and we concur, that Minnesota corporate law governs activities related to SSE. We conclude, however, that we cannot at this juncture appropriately grant petitioners' motion for summary judgment on the basis of such law.

While Minnesota statutes may provide a mechanism for recapitalization of a corporation by majority shareholder vote, they also contain certain protections for minority shareholders. See Minn. Stat. Ann. secs. 302A.135, 302A.751 (West 1985 & Supp.

2000). In fact, Minnesota courts are authorized to "grant any equitable relief" deemed just when those in control of a corporation have acted "in a manner unfairly prejudicial toward one or more shareholders". Minn. Stat. Ann. sec. 302A.751(1)(b)(2). Unfairly prejudicial conduct has also been further defined as "conduct that frustrates the reasonable expectations of shareholders in their capacity as shareholders or directors of a corporation that is not publicly held or as officers or employees of a closely held corporation." Berreman v. W. Publg. Co., 615 N.W.2d 362, 374 (Minn. Ct. App. 2000).

Accordingly, it would appear that the rights of the Foundation under Minnesota law are intertwined with and could be limited by the reasonable expectations of the minority shareholders. Such expectations, in turn, would depend upon all of the circumstances relating to the preparation and carrying out of decedent's estate plan, including the reasonableness of potential interpretations of the Redemption Agreement. As the record is largely devoid of evidence pertaining to relevant surrounding circumstances, we cannot now rule as a matter of law that the Foundation did or did not have a right to recapitalize SSE.

B. Equal Diminishment of Value

Petitioners further argue that, in the event we disagree with their primary position, we should nevertheless grant summary

judgment on the alternative ground that "if the Redemption Agreement diminished the value of the stock, it equally diminished the value of the gross estate."  Petitioners maintain that the Redemption Agreement took effect no later than the moment of decedent's death and thus imposed any value-lessening constraints on the stock as it existed in the gross estate, prior to any distribution to beneficiaries.  This argument is essentially the converse of the first point on which respondent moves for partial summary judgment.  Because we grant respondent's motion on such point for the reasons discussed immediately below, we hold that petitioners are not entitled to summary judgment on their postulated alternative basis.

We therefore will deny petitioners' motion in its entirety.

## II.  Respondent's Cross-Motion for Partial Summary Judgment

### A.  Unitary, Unrestricted Gross Estate Valuation

Respondent asks this Court to find as a matter of law that, for gross estate purposes, "decedent's voting and non-voting stock interest in the Schwan Corporation which was held in a revocable trust ("1992 Trust") at the time of his death should be valued as a unitary holding, unrestricted by the terms of the 1992 Trust, the terms of the redemption agreement he executed prior to his Death ("Pre-Death Redemption Agreement") or the terms of the Schwan Corporation by-laws".  As indicated above, petitioners advance the contrary view that the Redemption

Agreement is to be taken into account in valuing the gross estate.  Accordingly, we must consider the nature of the interest to be included in decedent's gross estate.

As a general rule, the Internal Revenue Code imposes a Federal tax "on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States." Sec. 2001(a).  Such taxable estate, in turn, is defined as the "value of the gross estate", less applicable deductions.  Sec. 2051.  Section 2031(a) then specifies that the "value of the gross estate of the decedent shall be determined by including to the extent provided for in this part [sections 2031 through 2046], the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated."  In this connection, section 2033 broadly states that the "value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death."

Regulations further explain the valuation concept as follows:

> The value of every item of property includible in a decedent's gross estate under sections 2031 through 2044 is its fair market value at the time of the decedent's death * * * .  The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. * * * [Sec. 20.2031-1(b), Estate Tax Regs.]

The timing issue involved in placing a value on the gross estate was addressed by the Court of Appeals for the Fifth Circuit in the following oft-quoted pronouncement:

> Brief as is the instant of death, the court must pinpoint its valuation at this instant--the moment of truth, when the ownership of the decedent ends and the ownership of the successors begins. It is a fallacy, therefore, to argue value before--or--after death on the notion that valuation must be determined by the value either of the interest that ceases or of the interest that begins. Instead, the valuation is determined by the interest that passes, and the value of the interest before or after death is pertinent only as it serves to indicate the value at death. In the usual case death brings no change in the value of property. It is only in the few cases where death alters value, as well as ownership, that it is necessary to determine whether the value at the time of death reflects the change caused by death, for example, loss of services of a valuable partner to a small business. [United States v. Land, 303 F.2d 170, 172 (5th Cir. 1962).]

Thus, it is now generally held, including in this Court, that the estate tax is laid on the interest that passes or is transferred at death. Estate of Chenoweth v. Commissioner, 88 T.C. 1577, 1582 (1987). Furthermore, while in the typical scenario this interest will be identical to that held by the decedent, it must be recognized that situations can exist where death itself will change the value of a property interest. Likewise, case law also establishes that valuation should "take into account transformations brought about by those aspects of the estate plan which go into effect logically prior to the distribution of property in the gross estate to the

beneficiaries." <u>Ahmanson Found. v. United States</u>, 674 F.2d 761, 768 (9th Cir. 1981). Such predistribution transformations are of a different genre, and must be distinguished from, "changes in value resulting from the fact that under the decedent's estate plan the assets in the gross estate ultimately come to rest in the hands of different beneficiaries." <u>Id.</u>

Moreover, as a general premise and absent a predistribution transformation of the type described above, "the fair market value of the non-voting stock in the hands of an estate with sufficient shares of voting stock to ensure the estate's control of a corporation cannot be less than the value of the estate's voting stock." <u>Estate of Curry v. United States</u>, 706 F.2d 1424, 1427 & n.2 (7th Cir. 1983). Hence, in such circumstances stockholdings are typically viewed as an aggregate interest in the corporate concern.

In the present matter, however, petitioners characterize the Redemption Agreement as working a transformation which altered decedent's interest prior to its distribution. Consequently, they aver that the interest which passed at death was decedent's interest in SSE as impacted by and subject to the terms of the Redemption Agreement. Respondent, on the other hand, asserts that decedent's two-thirds interest in SSE was in no manner transformed before its distribution from the gross estate. Rather, according to respondent, the value-lessening restrictions

of the Redemption Agreement took effect only upon and because of the distribution to the Foundation. On the facts before us, we agree with respondent.

Since the Redemption Agreement placed no restrictions on decedent's freedom to use or dispose of his interest in SSE, the instrument clearly had no impact on the stock's value prior to his death. More importantly and notwithstanding the existence of the Redemption Agreement, neither did decedent's death cause his 25,915,076 shares in SSE to represent anything less than two-thirds of the equity and two-thirds of the vote in SSE. If, prior to the distribution to the Foundation, a hypothetical buyer could have purchased all of the stock from the Estate, such buyer would have succeeded to decedent's full interest, unrestricted by the terms of the Redemption Agreement. This follows from the fact that the Foundation is the only person or entity upon whom the Redemption Agreement would operate to require the surrender of shares. Hence, any changes in value accruing as a result of the Redemption Agreement would be a function of the stock's coming to rest in the hands of a particular beneficiary. Such changes do not involve a predistribution transformation required to be considered for purposes of the gross estate. See Ahmanson Found. v. United States, supra at 768.

Furthermore, if and when the Redemption Agreement became operative upon distribution of the stock to the Foundation, the

postulated reduction in value caused thereby would, as respondent correctly observes, stem from the balkanization of decedent's interest in SSE among multiple beneficiaries. If the Redemption Agreement were to be interpreted to require redemption of only the voting shares, the Redemption Agreement would essentially grant to the Foundation only decedent's equity interest plus a "term interest" in voting control, while simultaneously passing the "remainder interest" in voting control over SSE to other beneficiaries. Yet decedent's interest would nonetheless pass in its entirety. Decedent would have controlled SSE at his death and would have through his estate plan passed that control first to the Foundation and then to his descendants. Such is a situation where value is divided, not destroyed. We therefore conclude that the existence of the Redemption Agreement had no effect on the value of decedent's interest in SSE for gross estate purposes.

We are equally satisfied that neither the 1992 Trust nor the corporate bylaws constitute a relevant restriction to be taken into account in valuing the gross estate. As regards the 1992 Trust, case law indicates that restrictions contained in a revocable trust becoming irrevocable at death and essentially functioning as an instrument of transfer are to be ignored in making estate tax valuations. See Citizens Bank & Trust Co. v. Commissioner, 839 F.2d 1249, 1251-1252 (7th Cir. 1988), affg. an

unpublished Order of this Court.  With respect to the bylaws, the pertinent provisions merely afforded SSE an option to acquire its stock at fair market value in the event that a shareholder elected during life or at death to transfer the shares to a party other than a family member or a charity.  Since such terms do not limit transferability or prevent receipt of fair market value, they would not result in a lesser value for gross estate purposes.  Accordingly, we grant respondent's motion for partial summary judgment on this point and hold that decedent's shareholdings in SSE are to be valued in his gross estate as a unitary, unrestricted two-thirds interest in the company.

B.  Redemption of Only Voting Stock

Respondent secondly requests this Court to find as a matter of law that "The Pre-Death Redemption Agreement executed by Marvin M. Schwan, the Foundation, Marvin M. Schwan's revocable trust and the Schwan Corporation required the Foundation to deliver, and the Schwan Corporation to redeem, only voting stock, not both voting and non-voting stock".  Respondent contends that the language of the document as a whole, augmented by the legends stamped on various stock certificates, clearly provides that only the voting shares were to be redeemed.  Petitioners in opposition assert that the express terms of the Redemption Agreement plainly require redemption of both classes.

- 22 -

The Redemption Agreement states that it is to be governed by and interpreted in accordance with the laws of the State of Minnesota.  Under Minnesota law, "The cardinal purpose of construing a contract is to give effect to the intention of the parties as expressed in the language they used in drafting the whole contract."  Art Goebel, Inc. v. N. Suburban Agencies, Inc., 567 N.W.2d 511, 515 (Minn. 1997).  Furthermore, "When parties reduce their agreement to writing, parol evidence is ordinarily inadmissible to vary, contradict, or alter the written agreement. But parol evidence is admissible when the written agreement is incomplete or ambiguous to explain the meaning of its terms." Flynn v. Sawyer, 272 N.W.2d 904, 907-908 (Minn. 1978).

The Minnesota Supreme Court has also instructed that "A contract is ambiguous if, based upon its language alone, it is reasonably susceptible of more than one interpretation."  Art Goebel, Inc. v. N. Suburban Agencies, Inc., supra at 515; see also Metro Office Parks Co. v. Control Data Corp., 205 N.W.2d 121, 123 (Minn. 1973).  A determination of ambiguity is a question of law and "depends, not upon words or phrases read in isolation, but rather upon the meaning assigned to the words or phrases in accordance with the apparent purpose of the contract as a whole."  Art Goebel, Inc. v. N. Suburban Agencies, Inc., supra.

Suffice it to say that, on the record before us, we find the Redemption Agreement to be ambiguous.  We note that both sides raise colorable textual arguments, that even the 1994 Amendment to the Redemption Agreement characterizes the original instrument as susceptible to differing interpretations, and that this issue formed the basis for protracted and contested litigation extending over a period of several years before eventually settling.  Such circumstances belie the parties' representations that the document is clear on its face.

Accordingly, we conclude that the issue of decedent's intent in drafting the Redemption Agreement remains a question of material fact as to which extrinsic evidence will aid in reaching an appropriate result.  At present the record is lacking in information which could shed light on decedent's intentions, and we therefore leave this matter for development at trial.  We will deny respondent's motion for partial summary judgment on this second point.

C.  <u>Treatment of Taxes and Administrative Expenses</u>

The third point upon which respondent asks for judgment as a matter of law is as follows:  "Under the operative documents, and state law properly applied, the burden of taxes and administrative expenses shall be borne by the Foundation."  More specifically, it is respondent's position that:  (1) Any charitable deduction allowable to the Estate for the bequest to

the Foundation must be reduced by taxes and administrative expenses, and (2) a postmortem bonus remitted by SSE to the Estate cannot be considered to have paid those expenses so as to leave the charitable deduction unreduced.

Petitioners do not contest that the charitable deduction may be reduced if payments for administrative expenses and taxes exceed the amount of the 1992 Trust residue (meaning in this context residual trust assets other than the SSE stock). Rather, petitioners maintain that the bonus received by the Estate should be included in computing the residue available for paying these obligations. In that event, petitioners calculate that sufficient funds would exist to cover all taxes and expenses without need to resort to the charitable gift. We, however, conclude that petitioners' view is contrary to the express terms of the will and trust agreement executed by decedent.

As a general rule, section 2055 permits a deduction for the value of bequests to charitable entities but limits the amount of such deduction to "the value of the transferred property required to be included in the gross estate." Sec. 2055(a), (d). Here, the parties agree that the postmortem bonus was not includible in the gross estate. The sum was instead includible in the income of the Estate for fiduciary income tax purposes. As a result, receipt of the bonus did not increase the total amount otherwise potentially deductible under section 2055. The relevant question

therefore is whether the bonus may be applied to payment of taxes and expenses in lieu of gross estate assets which would support a deduction if transferred to charity.

The property from which a decedent's debts and taxes are payable and the order of payment of those items are governed by applicable State law.  See <u>Riggs v. Del Drago</u>, 317 U.S. 95, 97-98 (1942).  The pertinent law in this case regarding the administration of the Estate is that of South Dakota.  Under South Dakota law as in effect in 1993, where a decedent's will, construed together with other testamentary instruments, directs the source from which obligations are to be paid, such directions are given effect.  See S.D. Codified Laws secs. 29-5-1, 29-5-2, 29-5-4, 29-6-7, 29-7-1 (1993).  The statutory codification then provides additional default rules to ensure a complete and orderly disposition of the decedent's property.  Accordingly, we must first consider the portions of decedent's will and the 1992 Trust agreement which speak to this issue.

Decedent's will states the following regarding taxes and expenses:

> <u>Payment of debts, expenses and death taxes</u>.  I direct my Executors to pay out of my residuary estate my legally enforceable debts and the expenses of my last illness, funeral and burial.  I direct that all inheritance, estate, succession and transfer taxes * * * which may be imposed by any domestic or foreign law by reason of my death or because of the transfer,

disposition or distribution of any property deemed a part of my taxable estate at my death shall be paid out of the principal of the Trust Estate held pursuant to the provisions of Article 3 of the Trust Agreement (as amended from time to time) dated August 1, 1985 * * *

The foregoing is then augmented by the provisions of the 1992

Trust agreement set forth below:

2.3  <u>Disposition of Trust Estate upon the Settlor's death</u>.  Upon the death of the Settlor, whatever then constitutes the Trust Estate, both principal and all undistributed income, shall be held and distributed pursuant to the provisions of Articles 3, 4, 5, 6, 7, 8 and 9 of this Agreement.

ARTICLE 3

3.1  <u>Payment of death taxes</u>.  The Trustees shall pay all of the inheritance, estate, succession and transfer taxes * * * which may be imposed by law by reason of the Settlor's death or because of the transfer, disposition or distribution of any property deemed a part of the Settlor's taxable estate at his death. * * *

3.2  <u>Payment of legacies, debts and expenses</u>.  The Trustees shall pay out of the Trust Estate any legacies made in the Settlor's will for which the Settlor's probate estate is not sufficient, and may so pay out of the Trust Estate, or reimburse the representative of the Settlor's estate for, such of the Settlor's debts and such of the expenses of his last illness, funeral and burial as the Trustees, in the exercise of their discretion, may deem necessary or advisable, taking into consideration any other assets available for such purposes and the liquidity of other assets.

3.3 <u>Source of Payments</u>.  All payments made pursuant to the provisions of paragraph 3.1 or 3.2 * * * shall be made from the assets of the Trust Estate remaining after complying with the provisions of Articles 4, 5, and 6 of this Trust Agreement and from assets of the Trust Estate otherwise disposed of under the provisions of paragraph 8.2 of Article 8 of this Trust Agreement.  If stock of Schwan's Sales Enterprises, Inc., must be used for any payment, non-voting stock shall be used before voting stock.  * * *

Given these directives, the principal difficulty with petitioners' argument is that it conflicts with the explicit language of paragraph 2.3 above.  That paragraph states that "Upon the death of the Settlor, whatever <u>then</u> constitutes the Trust Estate" (emphasis added) shall be subject to distribution in accordance with the enumerated provisions.  One such provision is Article 3, which governs payment of taxes and expenses.  Hence, assets received after decedent's date of death are not covered by Article 3 and consequently are not among those which decedent specified are to be used to pay tax and expense obligations.  Although petitioners reference an ability on the part of the fiduciaries to allocate the bonus to principal under the Revised Uniform Principal and Income Act, no amount of such allocating can retroactively render the bonus <u>then-existing</u> principal.  The controlling testamentary instruments simply do

not allow for taxes and expenses to be charged to postmortem income.  We therefore will grant respondent's motion for partial summary judgment on this point.

To reflect the foregoing,

<u>Appropriate orders will be issued denying petitioners' motion for summary judgment and granting in part and denying in part respondent's cross-motion for partial summary judgement</u>.